**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.                                                                    No. 97-1020

CWIOF MARYLAND, INCORPORATED,
Respondent.

On Application for Enforcement of an
Order of the National Labor Relations Board.
(5-CA-24908, 5-CA-25116)

Argued: July 10, 1997

Decided: October 2, 1997

Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

_____

Application for enforcement granted in part, denied in part, and
remanded by published opinion. Judge Michael wrote the opinion, in
which Judge Motz joined. Judge Niemeyer wrote a separate opinion,
concurring in part and dissenting in part.

_____

**COUNSEL**

**ARGUED:** William Maurice Bernstein, NATIONAL LABOR
RELATIONS BOARD, Washington, D.C., for Petitioner. Joel Ibert
Keiler, Reston, Virginia, for Respondent. **ON BRIEF:** Frederick L.
Feinstein, General Counsel, Linda Sher, Associate General Counsel,
Aileen A. Armstrong, Deputy Associate General Counsel,
NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for
Petitioner.

**OPINION**

MICHAEL, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its order entered against CWI of Maryland, Inc. (CWI), a trucking company. The Board's order affirmed the decision of an administrative law judge, who found that CWI had committed numerous and severe unfair labor practices during a unionization drive by the Drivers, Chauffeurs, Warehousemen and Helpers, Local 639, affiliated with the International Brotherhood of Teamsters, AFL-CIO (the Union). The ALJ concluded that CWI had violated § 8(a)(1)-(5) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(1)-(5), by surveilling, interrogating, and threatening its workers; firing one driver based on a discriminatory motive; constructively discharging the entire bargaining unit based on a discriminatory motive; and refusing to bargain. To remedy these violations, the Board ordered CWI to cease and desist in its illegal practices, to recognize and bargain with the Union, to offer reinstatement to terminated drivers, and to restore the working conditions that existed prior to the unfair labor practices. After considering the petition, we grant enforcement of most of the Board's order and remand for further proceedings on compliance. However, because we conclude that CWI did not violate § 8(a)(3) when it fired driver Richard Pace, we deny enforcement of the portion of the Board's order that requires the company to reinstate Pace.

I.

CWI hauls trash by truck from Washington, D.C., to landfills in Virginia. It currently operates out of facilities in Beaver Heights, Maryland, and King William County, Virginia. The company does most of its trucking under a contract with Browning Ferris Industries (BFI). CWI drivers haul trash from BFI's Washington location to a landfill in King and Queen County, Virginia. The distance from the BFI site to the landfill is about 140 miles.

Prior to August 1994 most CWI drivers would make two runs from BFI's pickup site to the landfill each day. The drivers would get their trucks at the Beaver Heights location, drive to the BFI site and pick

2

up a load of refuse, deliver the refuse to the landfill, and then return to BFI for another load. The two runs required about 585 miles of driving over 12 to 16 hours. The drivers earned $100 per run and worked three to six days a week. In the spring of 1994 some drivers mentioned to CWI's president, Wilton (Tony) Lash, that they were driving more hours than were permitted under Department of Transportation (DOT) regulations. Lash responded by asking the American Trucking Association (ATA) to review CWI's operations. The ATA review, conducted in July 1994, found that the hours required to drive the distance covered by two round trips exceeded the limits set by DOT regulations, which limited driving time to 10 hours per day, with additional limits of 15 consecutive hours on duty and 70 hours on duty in eight consecutive days. After the ATA issued its report, Lash met with the drivers and announced that their runs would be cut to one per day. However, Lash also said he would look for a drop site in Virginia that would allow the drivers to make two runs per day from BFI's Washington location to the drop site. Under this plan other drivers would be hired in Virginia to drive from the drop site to the landfill. Lash asked that the drivers "hang with [him]" until something could be worked out. J.A. 606. In the meantime, drivers made only one run per day, five or six days a week, and continued to receive $100 per run.

On September 26, 1994, about six weeks after the runs were reduced, three of the drivers met with James Woodward, an agent for the Union. These drivers decided to solicit authorization cards, and by mid-October they had collected cards from 31 of the 44 drivers at CWI. On November 9 Woodward notified Lash by telephone that he represented a majority of the drivers. Woodward and Lash arranged a meeting, but CWI's counsel, Joel I. Keiler, came to the meeting instead of Lash. Woodward claims he told Keiler that the Union represented a majority, and Keiler allegedly replied,"We'll never recognize the union." J.A. 60. Keiler's account differs substantially: according to Keiler, Woodward claimed that he could easily organize CWI and that he mainly wanted to secure pension benefits and union health insurance for the drivers.[1]

_____

[1] Keiler took the stand at the hearing before the ALJ to contradict Woodward's testimony about what was said at their meeting. Keiler has

3

Tarik Muhammad, one of the drivers who signed an authorization card, claimed he was confronted by Lash in early November. According to Muhammad, Lash asked him who was "causing the stink in the company." J.A. 279. When Muhammad replied that he did not know anything about a "stink," Lash told Muhammad that his name had come up as one of the drivers "who was causing a stink." Id. Muhammad asked Lash what "causing a stink" meant, and Lash defined the phrase as "guys going behind [my] back to join the Union." J.A. 280; see J.A. 988. Lash added that he had talked to CWI's operations manager, Dwayne (Dino) Sawyer, and had been surprised to hear Muhammad's name mentioned as one of those involved. Lash then began to recount all of the ways he had tried to help the drivers in the past, including a gift he had given to Muhammad when he was sick and unable to work. Muhammad told Lash that he "wasn't about the business of raising any type of stink with anybody" but also said he did not see why signing a union card "has anything to do with a stink." J.A. 280-81; see J.A. 988. Lash told Muhammad that the drivers who wanted a union "[were not] going to force him to do anything he didn't want to do." J.A. 279.

Lash called a meeting of his drivers on November 10. Lash began by saying, "There's a lot of stink going on, and there's a devil amongst us." J.A. 155, 609. Lash did not mention the Union. He also mentioned that he was still looking for a drop site that would permit drivers to make two runs in a day.

On November 18 CWI terminated driver Richard Pace. Pace, who had worked for the company for about three months, had eleven unex-

_____

represented CWI in all phases of this controversy, including the hearing before the ALJ and the briefing and argument before us. The ABA Model Rules of Professional Conduct require that "[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness . . . ." Model Rules of Professional Conduct Rule 3.7(a) (1984). When pressed on this point at oral argument, Keiler told us he was surprised by Woodward's testimony and had not expected any controversy at the hearing about what had transpired at their meeting. In any event, Keiler conceded to Woodward's version of the meeting for purposes of the petition before us.

4

cused absences and had received a verbal warning for speeding. The triggering event for Pace's termination occurred on Saturday, November 12, when he reported to work. Pace says he left the reporting site after being told there were no more runs to be made that day. However, a memo prepared by Jerome Freeland, CWI's loading operator, reported that Pace had left prematurely. Pace also claims he was told he would not be needed until Tuesday, November 15. When Pace arrived for work on Tuesday, operations manager Sawyer gave Pace a three-day suspension for failing to report for work on Saturday and Sunday. Pace protested that he had been in on Saturday, and Sawyer, noting CWI's need for drivers, changed Pace's suspension to a written warning. Pace worked the next three days. However, on November 18 Sawyer told Pace that he was being terminated because he "didn't make [his] 90-day probation." J.A. 162. Pace responded that he had not been advised of any probationary period. Pace also claimed he had been hired on July 30 rather than August 18 and therefore his probationary period would have ended in October. After first disputing Pace's assertion about the July 30 starting date, Sawyer then claimed that the probationary period was 90 working days. After further argument Sawyer allegedly told Pace, "You didn't make your 90 days. That's the excuse." J.A. 164.

A Union meeting was held on November 19 at the Union's hall in Washington, D.C., a substantial distance from CWI's headquarters in Beaver Heights. Company employees at the meeting noticed Tony Lash's son, Duke Lash, and several other persons standing beside a car across from the hall. When Woodward (the Union agent) began to walk toward the car, Duke Lash and the others quickly got into the car and sped off. Later in the afternoon, Tony Lash himself drove by the Union hall, tooted his horn, and waved to some of the employees. Lash later claimed that he passed by the hall because it was on his way back from lunch.

The Union filed its representation petition on December 15. On December 22 Tony Lash called a meeting of his drivers and said they had "forced his hand." J.A. 125. He told them he had obtained a drop site in King William County, Virginia. However, in order to haul to this new drop site, which was approximately 100 miles from the BFI pickup site, drivers would be required to report to work at the new site instead of the facility in Beaver Heights. Since most of the drivers

5

lived relatively close to the Beaver Heights facility, the (unpaid) commute to the King William County site would be about 90 to 125 miles. Lash said he was making the change to save on costs, and he gave the drivers six days to decide if they wanted to remain with the company. That same day (December 22) Keiler sent Woodward a letter concerning the change in the reporting site.

Around this time Sawyer denied extra work to Joe Nelson, one of the three drivers who first met with Woodward to discuss unionization. Nelson had requested extra hours; his request was initially granted, but Sawyer later reneged. When Nelson asked why he was being denied the extra hours, Sawyer explained to Nelson that he "had to lower the boom on [him]." J.A. 217.

Woodward paid a visit to Tony Lash on December 28. Woodward claims that he again requested recognition and warned Lash that the unfair labor practices would cost CWI a lot of money. Lash claims that he told Woodward that CWI was moving to save money on taxes, unemployment insurance, and workers' compensation. Keiler wrote Woodward a letter on December 31, accusing Woodward of bypassing Keiler. Keiler told Woodward that the move to the new drop site would take effect on January 3, 1995.

CWI started using the new King William County location as the reporting site in early 1995, even though the site (at least until May) consisted only of "an open lot with rocks and a strip of concrete to keep the trailers from sinking into the mud." J.A. 992. Although Tony Lash had initially offered continued employment to any driver willing to make the commute, several were laid off or given layoff notices without any chance to continue. Between January 4 and 17, 1995, 38 CWI drivers were terminated and at least 20 new drivers were hired. Sawyer told one of the drivers, Carl Stevenson, that CWI was terminating him because he had been seen at a union meeting. Only one of the original drivers, Mark Barnes, decided to make the commute to the King William County site, which was 125 miles away from his home. Barnes asked to start his runs from the Beaver Heights location, but Lash denied this request, saying that "it wasn't . . . possible with the union still keeping things going." J.A. 112. Lash indicated to Barnes that any attempt to unionize would be futile, as he would delay the process in court and even declare bankruptcy if necessary.

6

In May 1995 Barnes asked to switch to a different driving job with CWI. The company had a fleet of smaller trucks that made runs within Washington, D.C., and the drivers of these trucks still reported to the Beaver Heights location. Barnes's request to switch jobs was denied by Sawyer, who said he could not accommodate Barnes "because he would have to hire everybody else back because of the problems that it would create with the union." J.A. 117. Barnes quit his job later in May.

The representation election was held on February 3, 1995. Out of 46 eligible voters, only 13 showed up to vote. Ten votes were challenged by CWI because the voters had been terminated by the time of the election. The ALJ ultimately decided (with the Board affirming) that the challenged ballots should be counted. If all votes are counted, the Union wins the election by ten votes to three. Issues relating to the results of the vote are not before us. See infra n.13.

Meanwhile, the Union had filed charges against CWI on November 22, 1994, and the General Counsel filed his first complaint on January 27, 1995. This complaint alleged that CWI had engaged in surveillance of the employees' union activities and that Pace had been fired for his participation in union activities. On February 13, 1995, the Union filed a second charge claiming that CWI had failed to bargain with the Union and that 45 employees had been terminated for union activity. The Union amended this charge on May 22 and again on August 22 to provide greater factual detail. The General Counsel combined the two charges and filed a consolidated complaint on September 27. The consolidated complaint included allegations about CWI's decision to move its reporting site and the constructive discharges caused by the move, Lash's comments blaming the move on the Union, and CWI's refusal to bargain about the effects of the move. The consolidated complaint sought an order requiring CWI to bargain with the Union and to restore the status quo prior to CWI's decision to move the reporting site.

The case was tried before an ALJ from December 11 to 15, 1995. The ALJ concluded that the company had violated § 8(a)(1) through its surveillance, interrogation, and threats concerning union activity. The judge also determined that CWI's requirement that the drivers report to the King William County drop site and CWI's termination

7

of Pace violated § 8(a)(3). Because a majority of the drivers had signed Union authorization cards and because the Union had demanded recognition and been refused, the ALJ also held that CWI's "hallmark" unfair labor practices constituted a refusal to bargain in violation of § 8(a)(5). As a remedy for these violations, the ALJ imposed a cease and desist order, required CWI to return the reporting site to the Beaver Heights location, ordered that the terminated drivers be rehired and made whole from the date of their termination, and established the Union as the bargaining agent for the employee unit. The Board affirmed the ALJ's decision in all relevant respects and now seeks to enforce its order against CWI.[2]

II.

The ALJ determined that CWI had violated §§ 8(a)(1), 8(a)(3), and 8(a)(5) of the Act, 29 U.S.C. § 158(a)(1)-(5), and the Board affirmed. We review these determinations one section at a time.

A.

Section 8(a)(1) of the Act makes it unlawful for an employer to "interfere with, restrain, or coerce employees in the[ir] exercise of" rights under § 7 of the Act. CWI's actions that were held by the ALJ to violate § 8(a)(1) can be grouped into three broad categories: surveillance, interrogation, and threats. First, the ALJ determined that Tony Lash's comments to Muhammad, which included an accusation that Muhammad was one of those causing a "stink," created the impression that Lash was monitoring the employees' union activities. The ALJ also concluded that the presence of Duke Lash outside the Union hall further contributed to the impression of surveillance, as did Tony Lash's drive by the hall, during which he waved to the employees and blew his horn.[3] Second, the ALJ determined that Tony

_____

**2** For the text of the Board's order and the ALJ's decision, see CWI of Maryland, Inc., 321 N.L.R.B. ___ (1996) (No. 101).
**3** Tony Lash claimed that he only passed by the hall because it was on his way back from the place he had eaten lunch that day. The ALJ, however, noted that Lash's reasons for being there were "irrelevant," J.A. 993, because the illegality of the conduct does not depend on the employer's motive. The ALJ concluded that Lash's activities, which called attention to his presence, interfered with the employees' expectations that they could attend the meeting at the Union hall without fear of employer surveillance.

8

Lash's interrogation of Muhammad, during which Lash portrayed union activity as a "stink," asked whether Muhammad was causing a stink, and reminded Muhammad of a favor he had done for him, was sufficiently coercive to constitute a § 8(a)(1) violation. Finally, the ALJ found that several comments by Tony Lash and Sawyer constituted threats that were intimidating and coercive. The comments cited by the ALJ were Sawyer's statement that he had to "lower the boom" on Nelson, Lash and Sawyer's statements to Barnes blaming the change in reporting sites on union activity, Lash and Sawyer's rejection of Barnes's requests to work out of the Beaver Heights facility because union activity was continuing, Sawyer's statement to Stevenson that he had been seen at a union meeting and would be terminated, and Lash's repeated comments that union activities would be futile.

CWI agrees that these incidents, if they actually occurred, would constitute § 8(a)(1) violations. CWI's primary argument is that the ALJ erroneously believed the testimony of the Union's witnesses while disbelieving the testimony of CWI's witnesses. After claiming that only Barnes and Muhammad testified as to the bulk of the alleged 8(a)(1) violations, CWI argues that their testimony is not credible. Muhammad is not to be believed, according to CWI, because he claimed that he signed a written statement and gave it to the NLRB lawyer. The NLRB lawyer, however, said she had no knowledge of such a statement. CWI claims that Barnes is not to be believed because he allegedly contradicted himself about his reason for quitting his job in May. Finally, CWI takes special exception to the ALJ's use of Tony Lash's "stink" and "devil in our midst" comments. CWI notes that Barnes testified at the hearing that Lash made the "stink" and "devil in our midst" statements but on cross-examination acknowledged that he did not mention them in his earlier affidavit. CWI also highlights the testimony of two other employees, Joe Nelson and Alvin McElveen, who testified that the "stink" and "devil" references related to Lash's concern that someone was undercutting his relationship with BFI.

We begin our examination of the ALJ's factual findings by recognizing that we are to assess such findings "only to determine whether they are supported by substantial evidence." Fieldcrest Cannon, Inc. v. NLRB, 97 F.3d 65, 69 (4th Cir. 1996). Moreover, "[w]hen factual

9

findings rest upon credibility determinations, they should be accepted by the reviewing court absent `exceptional circumstances.'" Id. We have defined such "exceptional circumstances" as including "cases where `a credibility determination is unreasonable, contradicts other findings of fact, or `is based on an inadequate reason or no reason at all.'"" Id. at 69-70. Absent these circumstances, "careful fact-finding . . . is entitled to respect." Id. at 70.

The ALJ here offered specific reasons for crediting the testimony of Barnes and Muhammad. The ALJ found Barnes to be an "honest witness[ ] with [a] better than average recollection[ ]." J.A. 989 n.11. Similarly, the ALJ believed Muhammad's testimony to be "credibly offered." J.A. 988 n.7. The ALJ also believed Barnes's testimony about Tony Lash's anti-union statements in part because "Lash did not deny most of the specific statements Barnes attributed to him." J.A. 993 n.28. The ALJ found Muhammad's testimony about his discussion with Lash to be likewise "uncontradicted." J.A. 988 n.7.

CWI claims that inconsistencies in Barnes and Muhammad's testimony demonstrate their lack of credibility. Barnes allegedly cannot be believed because he offered contradictory reasons for his ultimate decision to quit CWI. However, we fail to see any contradiction in Barnes's testimony on this point. On direct examination Barnes said he quit because "[m]y car . . . had broke[n] down and I was unable to make the trip anymore, and I was getting to the point where I was becoming exhausted and I just couldn't do it." J.A. 118. Barnes later said on cross examination that he bought a new car while he was still working for CWI. CWI claims that this statement contradicts his prior testimony, apparently because it shows that he still had transportation when he left CWI. However, Barnes said that, along with his car breaking down, he was "becoming exhausted" and "just couldn't do it." J.A. 118. We see no real contradiction. CWI attacks Muhammad because he testified that he signed a written statement, and the NLRB lawyer claimed never to have received such a statement from Muhammad. Although a fact-finder could take this apparent inconsistency into account in weighing Muhammad's credibility, it is not sufficient for us to reject the determination that Muhammad's testimony was truthful.**4**

_____

**4** We also note that after drawing out this inconsistency, counsel for CWI appeared more intent on using it as a rhetorical point than in discovering the reason for it.

10

Finally, CWI attempts to show that Tony Lash's "stink" and "devil in our midst" statements did not refer to union activity and thereby seeks to undercut Barnes and Muhammad's testimony. Two of the drivers most involved in the union drive, McElveen and Nelson, testified that Lash's statements at the November 10, 1994, drivers meeting about "stink" and "the devil in our midst" referred to a potential mole who was leaking information to BFI and trying to jeopardize BFI's contract with CWI. However, neither Muhammad nor Barnes contradicted Nelson or McElveen as to the meaning of "devil" and "stink" in the context of the November 10 meeting. Muhammad only testified that during their private conversation Lash defined "stink" as "guys going behind [my] back to join the union." J.A. 280; see J.A. 988. Barnes only claimed that he heard "stink" and "devil in our midst" at the November 10 meeting, as did Nelson and McElveen; Barnes offered no explanation as to what those words meant. We agree with CWI that the testimony of McElveen and Nelson indicates that Lash's comments may not have been taken as accusations of union activity by some of the employees at the November 10 meeting. It is still plausible, however, to believe Muhammad's testimony that the term had been given a different meaning by Lash during his private conversation with Muhammad.

After looking at all the evidence, we find no reason to conclude that the ALJ erred in his meticulous fact-finding. The testimony of Barnes and Muhammad stands on its own as credibly given. Moreover, the ALJ's determinations did not rest solely on Barnes and Muhammad. Woodward and Pace both testified that they saw Duke Lash surveilling the meeting at the Union hall. Tony Lash admitted to driving by the hall and blowing his horn, and he also testified that his son admitted to being outside the Union hall. Nelson testified to Sawyer's comment that Sawyer had to "lower the boom" on him, and Stevenson testified that he was told he was terminated because he had been seen at the Union meeting. In sum, we accept the ALJ's credibility determinations because we do not see any "exceptional circumstances" that require a different result. See Fieldcrest Cannon, 97 F.3d at 69-70.

CWI next argues that the statute of limitations bars many of the claims set forth in the NLRB's complaint. NLRA § 10(b) states that "no complaint shall issue based upon any unfair labor practice occur-

11

ring more than six months prior to the filing of the charge with the Board." 29 U.S.C. § 160(b). According to CWI, almost all of the allegations about the § 8(a)(1) violations were included in the unfair labor practice charge filed on August 22, 1995, more than six months after most of the § 8(a)(1) violations took place. CWI contends that because the August 22 charge was not filed within six months of the relevant events, these allegations were untimely.

We disagree. The August 22 charge merely amended a charge originally filed on February 13, 1995, to provide further specifics. Because the February 13 charge was filed well within the six-month statute of limitations, the complaint based on that charge is timely. Even if the August 22 charge can be considered a "new" charge that falls beyond the six-month limitations period, we recognized in FPC Holdings, Inc. v. NLRB, 64 F.3d 935, 941 (4th Cir. 1995), that "[a] complaint or an amended complaint may include allegations not in the original charge if the violations alleged occurred within six months before the charge and are `closely related' to the allegations in the charge." The three-part test for determining whether the allegations in a complaint are sufficiently related to a timely charge is: (1) whether the allegations in the complaint involve the same legal theory as the allegations in the charge, (2) whether the allegations arise from the same factual situation or sequence of events, and (3) whether the respondent would raise the same or similar defenses to both sets of allegations. Id. In this case the February 13 charge alleges, in relevant part, that CWI "made threats and promises to its employees to destroy their rights under the act." J.A. 788. The complaint elaborates by spelling out the threats and promises made by CWI's president, Tony Lash. For example, the complaint alleges that Lash (1) blamed the Union for the move to Virginia, (2) warned employees that working to unionize would be futile because he would "keep the matter tied up" in legal proceedings, J.A. 803, and (3) threatened to put CWI into bankruptcy if the Union was ever designated as bargaining agent. Thus, the broad allegations in the charge involve the same legal theory as the § 8(a)(1) violations alleged in the complaint, both sets of allegations arise from the same sequence of events, and CWI would raise the same legal defenses against both. The allegations in the complaint are therefore "closely related" to the claims in the February 13 charge.

12

Finally, CWI claims that Tony Lash has two sons who go by the name of "Duke." One is a part owner of CWI, while the other is not associated with CWI but does visit the company from time to time to fill the vending machines. According to CWI, we must assume that the employees meant the second "Duke" when they claimed that Duke Lash was sitting outside the Union hall prior to the meeting. However, CWI failed to raise this issue during cross-examination of the employees who testified to seeing Duke Lash. CWI cannot now complain of ambiguity when it did nothing to address any ambiguity during the hearing. The ALJ found that the employees were unaware that there were two "Dukes" and therefore concluded that they meant the one who was associated with the company. CWI offers no real reason why this conclusion is unreasonable, and we find no reason to disagree with the ALJ's determination.

CWI's arguments do not present any grounds for overturning the ALJ's careful § 8(a)(1) determinations. The ALJ properly concluded that CWI repeatedly violated § 8(a)(1) by its attempts to interfere with, restrain, and coerce the CWI drivers in the exercise of their rights under § 7 of the Act.

B.

The ALJ concluded that CWI violated § 8(a)(3) of the Act (1) by constructively discharging its truck drivers by moving their reporting site from Beaver Heights, Maryland, to King William County, Virginia, and (2) by firing driver Richard Pace. We examine these determinations in turn.

1.

The ALJ concluded that CWI's decision to move the reporting site from Beaver Heights to King William County constituted a constructive discharge of its drivers. Section 8(a)(3) of the Act prohibits "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). We have recognized that "[w]here an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job because of union activities or union membership, the employer has construc-

13

tively discharged the employee in violation of § 8(a)(3) of the Act." J.P. Stevens & Co. v. NLRB, 461 F.2d 490, 494 (4th Cir. 1972); see also NLRB v. Bestway Trucking Co., 22 F.3d 177, 181 (7th Cir. 1994) ("A constructive discharge claim must satisfy two requirements. The employer's conduct must create working conditions so intolerable that an employee is forced to resign and the employer must have acted with the intent to discourage union membership . . ..". Thus, the move of the reporting site is a violation of § 8(a)(3) if CWI knew the move amounted to an "intolerable" change in working conditions and if CWI made the change to discourage its employees' union activities.

We agree with the ALJ that both elements were present in this case. The move of the reporting site meant that the drivers would have to make a round trip of 180 to 250 miles in order to get to and from work. This daily commute of roughly three to five hours is especially onerous because the drivers would be driving for another ten to twelve hours. The burden of the much longer commute clearly "rises to the level where [the employees'] working conditions became `so difficult or unpleasant as to force [them] to resign.'" J.A. 995 (second alteration in original) (opinion of ALJ) (quoting Crystal Princeton Refining Co., 222 N.L.R.B. 1068, 1069 (1976)).[5] CWI clearly knew what was in store for the drivers, as evidenced by Tony Lash's unpersuasive attempts to discount the length of the commute when he announced the change in reporting sites. Lash told the drivers, "It's not that much of a commute. . . . You all [just] think it is." J.A. 619. We also find that substantial evidence exists to show that CWI moved the site based on anti-union animus. Although Lash discussed the possibility of a new drop site at the fall meeting with the drivers, he mentioned nothing about the possibility of moving the reporting site.[6] If

_____

[5] In its Reply Brief CWI argues that the 180 to 250 mile commute does not constitute an intolerable change in working conditions. It claims that some of the new drivers commute up to 115 miles to the King William County site. There is no evidence to this effect in the record, however, and even if there was, it would not change our agreement with the determination that the move was an intolerable change in working conditions.
[6] The ALJ found that Tony Lash told the drivers at the fall meeting that their reporting site would not change if CWI established a drop site in Virginia. See J.A. 988 ("Lash told them that their routines would remain unchanged, that they would continue to pick up their tractors at [Beaver Heights] . . . ."). This finding is supported by the testimony of driver Lester Baddy.

14

anything, Lash indicated that things would improve for the drivers if they would just "hang with [him]." J.A. 606. Indeed, on December 19 Lash indicated in a letter to the King William County Director of Community Development that the drop site would only be used as a "[s]witching yard;" "[o]ur interstate trucks would bring in and drop loaded trailers with solid waste and immediately return with empty trailers going north." J.A. 932. Lash notified the drivers about the change in the reporting site during the same meeting at which he distributed information about the union election. He prefaced his news about the move by telling the drivers that they had "forced his hand," J.A. 125, and he only gave them six days to decide whether to accept the transfer. In January Lash explained to one driver that he was terminating him because Lash felt "his back was up against the wall." J.A. 218. After the move Lash told Barnes that he could not start his runs at Beaver Heights because "the union [was] still keeping things going." J.A. 112. There is ample evidence for the conclusion that CWI decided to move its facilities because of the employees' union activities.

CWI argues that the move was justified for economic reasons. It points to testimony, by both Tony Lash and some of the drivers, that Lash claimed at the December 22 meeting the move to Virginia would save CWI money on taxes, insurance, workers' compensation, and unemployment insurance. At the hearing Lash testified further that his "insurance man" told him CWI's insurance would be cheaper if he left the trucks overnight in Virginia. J.A. 639. These conclusory assertions by Lash, however, were all that CWI offered to prove that it moved the reporting site to save money. The ALJ concluded that CWI had "offered no probative evidence [that Lash had been told the costs would be cheaper] and no evidence that [CWI's] costs would be less in Virginia." J.A. 995. The ALJ determined that Lash's "bare and self-serving assertions are insufficient to carry [CWI's] burden of proving such motivation and [CWI's] failure to adduce such evidence, which would have been readily available if it existed, warrants an inference that no such evidence exists." J.A. 996. At oral argument CWI's counsel conceded that CWI had failed to introduce any objective evidence on this point, saying that CWI had decided that such evidence was unnecessary. We agree with the ALJ's conclusion that the record offers no substantive support for CWI's claim that the reporting site move was made for economic reasons.

15

CWI apparently believed that evidence of the reasons for the move was unnecessary because the Union never attempted to bargain over the move and therefore waived the issue. This argument assumes that the discharge of the employees was charged as a§ 8(a)(5) violation, a refusal to bargain collectively. However, both the NLRB's complaint and the ALJ expressly stated that the constructive discharge was a § 8(a)(3) violation, an attempt to discourage unionization. Even if the Union had not attempted to bargain over the issue (an argument that we explore below), this failure by the Union would have no effect on the ALJ's conclusion that CWI violated § 8(a)(3). CWI's waiver argument, at least in the § 8(a)(3) context, is therefore irrelevant.

2.

The ALJ also concluded that Richard Pace's discharge violated § 8(a)(3). In making this determination, the ALJ cited to the standard established in Wright Line, 251 N.L.R.B. 1083 (1980), enforced, 662 F.2d 899 (1st Cir. 1981), for resolving discrimination cases which turn on the employer's motivation. The Wright Line standard, as we set forth in FPC Holdings, requires the following proof:

> First, the General Counsel must make out a prima facie case that the employer's decision to lay off an employee was motivated by anti-union animus. The burden then shifts to the employer to prove affirmatively that the same action would have been taken even in the absence of the employee's union activity. To make out a prima facie case, the General Counsel must show (1) that the employee was engaged in protected activity, (2) that the employer was aware of the activity, and (3) that the activity was a substantial or motivating reason for the employer's action.

FPC Holdings, 64 F.3d at 942. Looking only at the General Counsel's evidence, the ALJ determined that the General Counsel had made a prima facie case based on the timing of Pace's firing and the evidence of anti-union animus demonstrated by CWI's other unfair labor practices. Under the ALJ's analysis, the burden then shifted to CWI to demonstrate that it would have fired Pace even in the absence of his support for the Union. The ALJ found that CWI's alleged reason for firing Pace was not supported by the record and therefore concluded

16

that Pace had been discriminatorily discharged. We must affirm the ALJ's factual findings if they are "supported by substantial evidence on the record as a whole." Vance v. NLRB, 71 F.3d 486, 489 (4th Cir. 1995); see also Fieldcrest Cannon, 97 F.3d at 69. However, we review de novo the legal standards used by the ALJ to assess the evidence. See Architectural Glass & Metal Co. v. NLRB, 107 F.3d 426, 430 (6th Cir. 1997); see also Virginia Concrete Co. v. NLRB, 75 F.3d 974, 980 (4th Cir. 1996) ("we are, of course, obligated to correct errors of law made by the Board").

Although the ALJ cited to the Wright Line standard as the method by which to evaluate Pace's discharge, we believe that the ALJ in fact allowed the General Counsel to establish a prima facie case merely by creating an inference that anti-union animus was a substantial or motivating factor in the discharge. Of course, in the original Wright Line opinion the Board said that a prime facie case could be made by a "showing sufficient to support the inference that protected conduct was a `motivating factor' in the employer's decision." Wright Line, 251 N.L.R.B. at 1089 (emphasis added). However, the Supreme Court has said that a prima facie case requires the General Counsel to prove by a preponderance of the evidence that the employer had a discriminatory intent that was a substantial or motivating factor in the discharge. See NLRB v. Transportation Management Corp., 462 U.S. 393, 400 (1983) ("The Board held [in Wright Line] that the General Counsel . . . had the burden of proving that the employee's conduct protected by § 7 [of the Act] was a substantial or a motivating factor in the discharge."); see also Director, Office of Workers' Comp. Programs v. Greenwich Collieries, 512 U.S. 267, 278 (1994) ("The NLRB's approach in Transportation Management is consistent with [Administrative Procedure Act] § 7(c)[, 5 U.S.C. § 556(d),] because the NLRB first required the employee to persuade it that antiunion sentiment contributed to the employer's decision. Only then did the NLRB place the burden of persuasion on the employer as to its affirmative defense."); Southwest Merchandising Corp. v. NLRB, 53 F.3d 1334, 1340 (D.C. Cir. 1995) ("Although the Board labels the General Counsel's burden that of establishing a `prima facie' case, it has, in fact, traditionally required the General Counsel to sustain the burden of proving that the employer was motivated by antiunion animus."); Holo-Krome Co. v. NLRB, 954 F.2d 108, 111 (2d Cir. 1992) ("[I]t is apparent that the Board uses the phrase `prima facie' case' to mean the

17

General Counsel's burden to prove by a preponderance of the evidence that protected activity was at least part of the motivation for the employer's adverse action."). Thus, a <u>Wright Line</u> "prima facie case" cannot be established merely by creating an inference that CWI was motivated by anti-union animus; the General Counsel must prove by a preponderance of the evidence that a discriminatory motive was a substantial or motivating factor in Pace's discharge.**7**

The ALJ, however, apparently believed that if an inference of discriminatory intent could be drawn from any of the General Counsel's evidence, a prima facie case was made. The ALJ cited to the Board's opinion in <u>Fluor Daniel</u> for the proposition that a prima facie case only requires a showing "`sufficient to support the inference that protected conduct was a `motivating factor.'" J.A. 994 (quoting <u>Fluor Daniel, Inc.</u>, 304 N.L.R.B. 970, 970 (1991)). The ALJ's actual analysis of the prima facie case confirms that he used an erroneous standard. The ALJ found that the prima facie case was established as follows:

_____

**7** The Board has created confusion about the standard by occasionally describing a prima facie case under <u>Wright Line</u> as a "showing sufficient to support the inference that protected conduct was a `motivating factor' in the employer's decision." <u>See, e.g.</u>, <u>Fluor Daniel, Inc.</u>, 304 N.L.R.B. 970, 970 (1991). This tendency to define the prima facie case incorrectly may in part stem from the definition of a "prima facie case" used in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). In <u>McDonnell Douglas</u> the Court established the well-known test for allocating burdens and the order of presenting proof in Title VII cases. The plaintiff's initial burden under the <u>McDonnell Douglas</u> test, also known as a "prima facie case," is merely to present facts sufficient to support an inference of discrimination. Because of the continuing confusion surrounding the nature of the General Counsel's burden, we agree with those courts who have suggested that the Board no longer use the term "prima facie case" in the <u>Wright Line</u> context. <u>See Southwest Merchandising</u>, 53 F.3d at 1340 n.8 ("Presumably, in the wake of <u>Greenwich Collieries</u>, it will no longer be appropriate to term the General Counsel's burden that of mounting a prima facie case; his burden is to persuade the Board that the employer acted out of antiunion animus."); <u>Holo-Krome</u>, 954 F.2d at 112 ("[I]t would be helpful if the Board would abandon the phrase [prima facie case], in view of its entirely different meanings in other contexts, and adopt some terminology that connotes proof of the elements of liability.").

18

The General Counsel has made out a prima facie case with respect to Pace, albeit not an overwhelmingly strong one. Pace was involved in union activities, as a participant if not as a leader. Respondent was aware of the employees' union activity in general, if not of Pace's individual participation, and bore animus against that activity. Moreover, Pace's discharge came 1 day before a scheduled union meeting of which Respondent apparently had notice and in the week following the Union's demand for recognition. This evidence is sufficient to shift the burden to Respondent.

J.A. 994 (footnote omitted). The evidence described by the ALJ is relatively weak; there is no direct evidence that CWI knew of Pace's union involvement or that CWI fired Pace because of that involvement. More important, the ALJ's analysis shows that he failed to consider the explanation for the termination given by CWI. In determining whether the General Counsel has shown that a discriminatory motive was a substantial or motivating factor in Pace's discharge, the ALJ clearly should have considered the whole record. The Board noted in Wright Line that "[t]he absence of any legitimate basis for an [employer's] action, of course, may form part of the proof of the General Counsel's case." Wright Line, 251 N.L.R.B. at 1088 n.12. Conversely, the presence of a legitimate explanation may work to negate the General Counsel's case. In this case, however, the ALJ did not consider CWI's evidence until after he had found that a prima facie case had been established. Thus, the ALJ improperly concluded that the burden had shifted to CWI without even considering CWI's explanation for the termination.[8]

_____

[8] Once again, the ALJ's misstep on this issue mirrors confusion on the part of the Board. In Hillside Bus Corp., 262 N.L.R.B. 1254, 1254 (1982), the Board held that "in assessing whether a prima facie case has been presented, an administrative law judge must view the General Counsel's evidence in isolation, apart from the[employer's] proffered defense." However, in Golden Flake Snack Foods, 297 N.L.R.B. 594, 594 n.2 (1990), the Board stated that "it is the evidence presented at the hearing, drawn from whatever source, which precisely determines whether or not there is a prima facie case of unlawful conduct." In Holo-Krome the Second Circuit resolved the issue in the following analysis:

Though the language of the Board's various pronouncements has created needless confusion, there appears to be a consistent rule

19

Because the ALJ used the wrong standard to determine whether Pace's termination was a violation of § 8(a)(3), we undertake our own analysis of the evidence to determine whether there was a violation. We must first determine whether the General Counsel has established by a preponderance of the evidence that a discriminatory motive was a substantial or motivating factor in Pace's firing. If the General Counsel fails to make such a showing, our inquiry is at an end.

As we noted earlier, the evidence presented by the General Counsel is relatively weak. Indeed, the ALJ acknowledged that the General Counsel's "prima facie case," which (under the ALJ's erroneous standard) consisted only of the General Counsel's evidence, was "not an overwhelmingly strong one." J.A. 994. Although Pace signed an authorization card and alleges that he was "very vocal" about his union activity, J.A. 152, the ALJ recognized that Pace was not a leader in the drive for unionization. The ALJ also declined to find that CWI had knowledge of Pace's participation in union activities. See J.A. 994 ("[CWI] was aware of the employees' union activity in general, if not of Pace's individual participation . . . ."). There is no direct evidence that Pace was fired because of his union activities, and the circumstantial evidence on this point is fairly slim: CWI committed other activities displaying anti-union animus, and Pace was discharged one day before a scheduled union meeting.

CWI, on the other hand, has presented legitimate reasons for firing Pace. Pace does not dispute that he had unexcused absences on September 6, 8, 13, 22, 23, and 26, October 29 and 30, and November 7, 1994. As the ALJ recognized, this is "a somewhat dismal atten-

_____

in practice. The Board wants the ALJ to make an initial determination as to whether the General Counsel has proved that protected activity was part of the motivation of the employer's conduct. In making that determination, the ALJ may use all of the record evidence. This clearly includes whatever explanation the employer gave to the employees during the episode, and, it apparently also includes the explanation that the employer presented at the hearing.

Holo-Krome, 954 F.2d at 113. Because the prima facie case requires a determination based on a preponderance of the evidence, we agree that an ALJ must consider the entire record in making that determination.

20

dance record."[9] J.A. 995. We have repeatedly found that unexcused absences are a legitimate explanation for a company's decision to terminate an employee. See Standard Prods. Co., Rocky Mtn. Div. v. NLRB, 824 F.2d 291, 294 (4th Cir. 1987) (finding no § 8(a)(3) violation in the termination of an employee who "[i]n the short space of his employment . . . had been repeatedly warned about his tardiness and unexcused absences"); McLean Trucking Co. v. NLRB, 719 F.2d 1226, 1229 (4th Cir. 1983) (finding no § 8(a)(3) violation in the termination of an employee who was often "tardy or inexcusably absent" from work); NLRB v. Instrument Corp. of America, 714 F.2d 324, 330 (4th Cir. 1983) (finding no § 8(a)(3) violation in the termination of an employee who had "spotty" attendance at work). In addition to the unexcused absences, Pace had received a warning from Sawyer in August after another employee complained that Pace was driving at excessive speeds while making a run. There is also direct evidence from Nelson, one of the leaders among the drivers in the effort to unionize, that CWI fired Pace because of poor performance. Nelson overheard Sawyer say that "Pace hadn't been showing up for work and they had some charges against him; that he was going to be fired." J.A. 227-28.

In finding against CWI, the ALJ emphasized CWI's failure to warn Pace that his job was in jeopardy and its failure to document its probationary policy as evidence that Pace's termination was not motivated by his poor performance. The ALJ's analysis on this issue, however, was shaped in large part by his prior determination that the burden of proof had shifted to CWI. See J.A. 995 ("[CWI] has failed to sustain the burden thus shifted to it."). The burden does not shift, however, unless the General Counsel proves (by a preponderance of the evidence) that a discriminatory motive was a substantial or motivating factor. Examining the facts under the proper standard, we do not find that CWI's failures prove a discriminatory motive. The company may not have given Pace a warning about his behavior, but it did document his absences and the speeding complaint. CWI's failure to warn Pace about his poor performance or its probationary period do not appear to us to be strong indicia of pretext. We do not think

_____

[9] The ALJ did not take into account Pace's additional absences on November 12, 13, and 14, about which the parties presented conflicting stories.

an employer is required to have finely tuned notice procedures in order to justify firing someone for excessive absenteeism; unexcused absences are usually obvious to the employee. CWI did not fire Pace based on a frivolous or infrequently sanctioned offense, nor was there any direct evidence to contradict the justifiable reason provided for his termination. And, although CWI's probationary policy may be less than well defined, we believe this smacks more of disorganization than it does of pretext.**10**

Thus, in analyzing the record as a whole, we conclude that the General Counsel did not establish by a preponderance of the evidence that a discriminatory motive was a substantial or motivating factor in Pace's discharge. We therefore decline to enforce the Board's order insofar as it requires the reinstatement of Pace.

C.

Finally, the ALJ held that CWI had violated § 8(a)(5) by failing and refusing to recognize and bargain with the Union. The ALJ based this conclusion on the Supreme Court's decision in NLRB v. Gissel Packing Co., 395 U.S. 575 (1969). A majority of authorization cards by itself generally does not entitle the union to recognition and bargaining. The employer's duty under § 8(a)(5) to recognize and bargain with the union usually arises only after union victory in a representation election. However, the Court held in Gissel that it is an unfair labor practice for an employer to fail to recognize a union with a card majority if that employer "engage[s] in unfair labor practices disruptive of the Board's election machinery." Id. at 600; see, e.g., Snyder Tank Corp. v. NLRB, 428 F.2d 1348, 1350-51 (2d Cir. 1970) ("The section 8(a)(1) and 8(a)(3) violations . . . provide sufficient support for the Board's conclusion that the company violated section 8(a)(5) . . . ."). Thus, a card majority is sufficient to place a duty to bargain on the employer if the employer has engaged in "`contemporaneous unfair labor practices likely to destroy the union's majority

_____

**10** The company form used to warn Pace about his absences has a box that can be checked to indicate that the employee is probationary. Although the box on Pace's form was not checked, the existence of the box is at least evidence that CWI had a probationary policy.

22

and seriously impede the election.'"[11] Gissell, 395 U.S. at 600. Of course, since this duty to bargain only arises if the employer has committed other unfair labor practices, the § 8(a)(5) violation might be considered a derivative consequence of the other unfair labor practices in cases where the union had a majority of cards. The remedy for this type of § 8(a)(5) violation is an order that the employer bargain with the union in good faith, even though the union has not won a representation election. See id. at 614-15.

As we explained in NLRB v. Appletree Chevrolet, Inc., 608 F.2d 988 (4th Cir. 1979), a Gissel bargaining order should only be imposed upon "findings (1) that the Union once had majority status, (2) that such status had been dissipated by pervasive misconduct on the part of the employer, (3) `that the possibility of erasing the effects of [these] past [pervasive] practices and of ensuring a fair election [or a fair rerun] by the use of traditional remedies, though present, is slight' and (4) `that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order.'" Id. at 996 (quoting Gissel, 395 U.S. at 614). We conclude that these requirements were met. The ALJ found that at least 31 employees out of a bargaining unit of approximately 44 presented valid authorization cards; this finding is uncontested. The ALJ also carefully analyzed CWI's unfair labor practices and found that they were sufficiently severe to warrant the imposition of a bargaining order. The ALJ first noted that the unfair labor practices at issue in this case -- the constructive discharge of all unit employees, threats that the business would close, and interrogation -- were "hallmark" violations sufficient to justify the imposition of a Gissel order on their own. See NLRB v. So-Lo Foods, Inc., 985 F.2d 123, 126 (4th Cir. 1992) ("hallmark" violations are regarded as "so coercive" that "their presence `will support the issuance of a bargaining order unless some significant mitigating circumstance exists'" (quoting NLRB v. Jamaica Towing, Inc., 632 F.2d 208, 212 (2d Cir. 1980))). The ALJ next found

_____

[11] This type of violation is often called a Gissel category II violation. A Gissel category I violation is one characterized by more pervasive and severe unfair labor practices; in such a case there is no need to inquire if the union has at one point represented a majority of the employees. See Gissel, 395 U.S. at 613-15; NLRB v. Horizon Air Servs., 761 F.2d 22, 28-29 (1st Cir. 1985).

23

"that all of the unit employees were vitally affected by the unfair labor practices, that those unfair labor practices were committed by high-level supervision, . . . and that it was likely. . . that [CWI] would commit further violations to forestall [the employees'] free participation in an election." J.A. 997. The ALJ further found that there were no circumstances to mitigate CWI's violations. We agree that CWI's violations were sufficiently pervasive to warrant a Gissel bargaining order, and CWI does not contest this point.

CWI contends that it did not violate § 8(a)(5) because the Union never made a request to bargain. Once again, CWI has confused the nature of the underlying violation. The § 8(a)(5) violation at issue in this case derives from CWI's §§ 8(a)(1) and 8(a)(3) violations. Although the Union had a card majority, CWI had not recognized the Union, and no election had taken place. Thus, the Union had no obligation to request bargaining over specific issues, because it was not yet deemed the bargaining agent for the drivers. In retrospect, the ALJ found that CWI's duty to bargain arose on November 15 or 16, 1994, because that was when Woodward had a card majority and requested recognition from CWI. However, CWI did not recognize the Union at that point, and the Union would not have been the drivers' bargaining agent had CWI not committed the "hallmark" unfair labor practices. Because the Union could only be considered the bargaining agent in retrospect, it had no duty to present a laundry list of bargaining demands to CWI in order to preserve those issues for future bargaining. The Union was not then the bargaining agent, and it could not have waived the bargaining rights of employees that it did not yet represent. All of the cases cited by CWI that find a waiver of bargaining rights by the union involved unions already recognized as the employees' bargaining agent. See, e.g. , NLRB v. Oklahoma Fixture Co., 79 F.3d 1030, 1033 (10th Cir. 1996); YHA, Inc. v. NLRB, 2 F.3d 168, 169 (6th Cir. 1993). A union cannot waive bargaining rights before it actually is entrusted with them.

III.

The Board used three types of remedies to enforce its order. First, it ordered CWI to cease and desist from its unfair labor practices. Second, it ordered CWI to bargain with the Union. Third, it required CWI to return to the status quo prior to the unfair labor practices by

24

reopening the drivers' reporting site in Beaver Heights, restoring any work transferred to another company for discriminatory reasons, and rehiring the terminated drivers to their former positions with back pay.

CWI claims that the reopening of the facility would be unduly burdensome and that the Board's order should not be enforced prior to a determination of "burdensomeness." However, the ALJ has already conducted an inquiry into the burdensomeness of the move. The ALJ found that "[a]s [CWI] has retained all of its facilities in Beaver Heights, Maryland [the location outside D.C.], and continues to conduct the same business operations, it appears that no undue hardship or cost will attach to its resumption of its operations as they existed prior to December 22." J.A. 998 n.40. Our review of the record reveals that CWI failed to provide any evidence that returning the reporting site to Beaver Heights would be burdensome. Given CWI's failure to provide any evidence that returning the reporting site to Beaver Heights would be burdensome, we conclude that the ALJ was well within his discretion in imposing this remedy. **12**

_____

**12** Our colleague dissents from the remedy discussion and two other parts of this opinion, saying that (1) "the record supports the manifestation of company intentions to create a Virginia drop site long before any union activity or organizational efforts began" and (2) "a business decision," such as this, cannot "be reviewed or undone by an order of the National Labor Relations Board in an effort to remedy later unfair labor practices." Post at 28. These comments overlook the real basis for the § 8(a)(3) constructive discharge violation and the specifics of the remedy. The violation was based on the change in the drivers' reporting site to Virginia, not the establishment of a drop site in Virginia. When CWI first announced the plan for a Virginia drop site, the drivers were told their reporting site would not change. The company announced the reporting site change only after union activity was in full swing. The remedy does not require CWI to close or move the Virginia drop site; instead it requires the company to reopen the reporting site at Beaver Heights. This arrangement, a Beaver Heights reporting site and a Virginia drop site, would be consistent with the plan first announced by CWI in response to the ATA report. Moreover, the Board said in its decision that CWI "will have the opportunity at the compliance stage to introduce relevant evidence concerning the burdensomeness of complying with the requirement that it reestablish Beaver Heights, Maryland, as the drivers' reporting site . . . ." J.A. 985 n.2.

CWI next contends that the remedies are invalid because the bargaining unit in the complaint is different than the bargaining unit in the ALJ's order. The bargaining unit in the ALJ's order is "[a]ll truck drivers employed by the Employer at its Beaver Heights, Maryland location." J.A. 999. The unit discussed in the complaint is "[a]ll truck drivers employed by the Employer at its Maryland, Washington, DC, and Virginia locations." J.A. 804. Although there appears to be some discrepancy between the two units, we agree with the ALJ that in actuality the differences are "immaterial." J.A. 996 n.36. The only difference between the two units is that the unit alleged in the complaint adds drivers from Washington and Virginia. However, there is no indication that CWI employs any drivers in Washington, and the ALJ held that moving the reporting site to King William County was a violation of § 8(a)(3). Because CWI was ordered to move its reporting site back to Beaver Heights, the difference in the bargaining units has no effect on the ALJ's order. Moreover, notwithstanding any difference in units, CWI had stipulated to the appropriateness of the Beaver Heights unit (the unit designated by the ALJ) when it signed the Stipulated Election Agreement.

CWI also claims that the ALJ cannot order it to "restore work transferred to any other company for discriminatory reasons," J.A. 999, because this issue was not mentioned in the complaint or litigated at the hearing. As the court said in NLRB v. Blake Construction Co., 663 F.2d 272, 279 (D.C. Cir. 1981), "[t]he Board may not make findings or order remedies on violations not charged in the General Counsel's complaint or litigated in the subsequent hearing." This rule, however, clearly applies only to "violations." In this case, the underlying § 8(a)(3) violation -- the constructive discharge of the employees -- was clearly alleged in the complaint. In order to remedy this violation, the Board ordered CWI to restore the status quo ante and rehire all of the terminated workers to their former jobs. This return to the status quo includes the restoration of any work that might have been transferred to other companies when the drivers were terminated. We believe this is a logical step in the remedy, and we conclude that the Board was well within its discretion in specifying this step.

The unfair labor practices committed by CWI in this case were pervasive: they ranged from threats and surveillance to the ultimate constructive discharge of the entire bargaining unit. The ALJ and the

26

Board have wisely fashioned a broad set of remedies that will attempt to restore the employees to their position prior to CWI's largely illegal campaign against the Union.**13**

IV.

In sum, we grant enforcement of the Board's order as to: (1) the § 8(a)(1) violations and the remedies for those violations, (2) the § 8(a)(3) constructive discharge violations and the remedies for those violations, and (3) the § 8(a)(5) violation and the remedy for that violation. We deny the Board's petition for enforcement of its order insofar as it relates to Richard Pace. We remand for further proceedings on compliance on the portions of the Board's order which we have enforced.

<u>PETITION GRANTED IN PART,</u>
<u>DENIED IN PART, AND REMANDED</u>

_____

**13** CWI contends that the current order for enforcement is not ripe for review because the issues relating to the conduct of the election were not resolved at the time the Board petitioned to enforce its order. Although the ALJ's opinion discusses the election, the Board's order does not. Instead, the order requires CWI to restore the status quo and bargain with the Union even if it is subsequently determined that the Union lost the representation election. The election issues were remanded for further consideration. This situation appears similar to the one in <u>NLRB v. Low Kit Mining Co.,</u> 3 F.3d 720, 729 (4th Cir. 1993). In that case the Board divorced the election issues from the unfair labor practice claims in its order, even though those issues had been tried together. The <u>Low Kit</u> court enforced the order, which concerned only unfair labor practices, even though the election issues were yet to be decided, and it left the election issues for another order. We likewise enforce the Board's order in this case and leave the election issues for another petition.

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:

I concur in Parts I., II.A., and II.B.2., but I find that I cannot concur in Parts II.B.1., II.C., and III., and with respect to those, I respectfully dissent. I believe that the record supports the manifestation of company intentions to create a Virginia drop site long before any union activity or organizational efforts began. The proposal to create the Virginia site was in response to an American Trucking Association report and not in response to any union activity. Indeed, the company met with its employees in August 1994 to discuss steps to remedy problems found by the American Trucking Association report, and this meeting included discussion of the creation of a Virginia drop site. Mr. Lester Baddy, one of the drivers, testified that at this meeting the company stated that it "would have to cut down to one load or also get a closer place," a drop site. The company discussed hiring additional drivers to report to the drop site or allowing existing drivers to commute to the drop site. The first meeting of employees with a union representative did not occur until September 26, 1994. It is not surprising, therefore, that the move to Virginia was never articulated as the basis of a complaint of an unfair labor practice. Accordingly, I cannot conclude that a business decision, which was not motivated by anti-union animus, can be reviewed or undone by an order of the National Labor Relations Board in an effort to remedy later unfair labor practices.

28