**SAM'S CLUB, A DIVISION OF WAL-MART STORES, INCORPORATED,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**United Food and Commercial Workers Union, Local 400, AFL–CIO, CLC,**
Intervenor–Respondent.

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

and

**United Food and Commercial Workers Union, Local 400, AFL–CIO, CLC,**
Intervenor,

v.

**SAM'S CLUB, A DIVISION OF WAL-MART STORES, INCORPORATED,**
Respondent.

Nos. 97–2721, 98–1085.

United States Court of Appeals,
Fourth Circuit.

Argued June 3, 1998.

Decided Nov. 17, 1998.

194

**ARGUED:** Paul Michael Thompson, Hunton & Williams, Richmond, Virginia, for Petitioner. Jill Ann Griffin, National Labor Relations Board, Washington, D.C., for Respondent. George Wiszynski, Butsavage & Associates, P.C., Washington, D.C., for Intervenor. **ON BRIEF:** Michael P. Oates, Hunton & Williams, Richmond, Virginia, for Petitioner. Frederick L. Feinstein, General, Linda Sher, Associate General, Aileen A. Armstrong, Deputy Associate General, Fred L. Cornnell, Supervisory Attorney, National Labor Relations Board, Washington, D.C., for Respondent. Carey R. Butsavage, Butsavage & Associates, P.C., Washington, D.C., for Intervenor.

Before LUTTIG, WILLIAMS, and MICHAEL, Circuit Judges.

Petition for review granted and cross-application for enforcement granted in part by published opinion. Judge WILLIAMS wrote the majority opinion, in which Judge LUTTIG joined. Judge MICHAEL wrote a dissenting opinion.

### OPINION

WILLIAMS, Circuit Judge:

Sam's Club, a division of Wal–Mart Stores, Inc., (Sam's) petitions for review from the National Labor Relations Board's (the Board) final order determining that it had committed violations of §§ 8(a)(1)and (a)(3)

of the National Labor Relations Act (the Act). *See* 29 U.S.C.A. § 158(a)(1) & (a)(3) (West 1973 & Supp.1998). The Board cross-petitions for enforcement of its order. For the reasons stated herein, we grant Sam's petition for review, grant the Board's cross-petition for enforcement in part and deny it in part.

## I.

This case involves a series of unfair labor practice charges arising out of Local 400, United Food and Commercial Workers Union's (the Union) attempt to organize the workers at Sam's in Landover Crossing, Maryland. The campaign culminated in an election held on July 8, 1994, during which the Sam's workers cast votes indicating whether they desired Union representation.[1] The factual discussion that follows is drawn from the ALJ's findings, the record, and the parties' briefs.

In January 1994, Sam's, a wholesale warehouse that sells goods at discount prices to fee-paying members, purchased a store that had been operating as a Pace Membership Warehouse (Pace). Sam's took over the store, retained 95% of the employees, and swiftly began to implement policies and procedures mandated by its parent company, Wal–Mart. Prior to Sam's purchase of Pace, the Union unsuccessfully had attempted to organize the workers at Pace. Several of the employees retained by Sam's harbored strong pro-union sentiment. As a result, after Sam's opened, the Union began organizing a new.[2] During the course of the Union's attempt to organize Sam's, three incidents relevant to this petition for review allegedly occurred.

## A.

As employees and management at Sam's were gearing up for the election, Union matters were a frequent topic of conversation. During one such conversation, in April 1994, a front-end employee, Danielle Porter, commented to the front-end supervisor, Debra Belt, while they were alone in an office that she hoped that the Union won the election. One of the women, either Porter or Belt, thereafter commented that Sam's would likely close the Landover store if the Union won the election, and the other woman agreed with that statement. It is not clear from the record which of the two women actually made the statement that she thought Sam's would close. The Union filed an unfair labor practice charge alleging that in this encounter Belt had threatened an employee by stating that the store would close if the Union won the election.

## B.

On March 30, 1994, Lawrence Perez, a member of the Union's organizing committee, asked his manager whether he could take his fifteen minute break. The manager told him to wait until another employee returned from break. Nevertheless, Perez immediately took his break. As a result, the manager issued a written warning for his insubordination. Subsequently, Perez refused to sign the warning form and claimed that he had done nothing wrong. Considering this refusal to sign the warning to be a further act of insubordination, the supervisor issued the next level of discipline, a "Day of Decision," a one-day suspension with pay during which Perez was instructed to think about what he had done wrong and return with a written plan of action on how to correct the behavior in the future. The Union filed an unfair labor practice charge asserting that Perez was unlawfully and discriminatorily suspended for supporting the Union.

## C.

During the course of the Union's election-related activities at Sam's, two special union representatives (SPURS), Tracie Burris and Terry Adgerson, were assigned to work at Sam's from late May 1994 through the election in July. Their purpose was to canvass the workers and speak to them about the

---

1. The employees voted against Union representation by a vote of 88 to 52.

2. According to the testimony of Sam's general manager Kent Kramer, this organizing campaign was the first attempt by a union to organize in the retail divisions of Wal–Mart Stores.

benefits of unionization. Frequently, Burris and Adgerson would discuss Union matters in front of Sam's in the parking lot during shift change when the employees would be entering and exiting the store. Often, the operations manager, Stan Harris, would encounter the SPURS on his routine front-end safety checks. Harris would exchange friendly greetings with Burris and Adgerson while they were discussing the Union with employees, and according to the testimony of Burris and Adgerson, occasionally would comment that Wal–Mart was a powerful company that would not tolerate a union. No unfair labor practice charge was filed as a result of these encounters between the SPURS and Harris, however, the General Counsel litigated this charge before the ALJ.

## II.

As a result of the foregoing events, as well as others not relevant to this petition, the Union filed three charges, each listing numerous objections to election activity [3] and unfair labor practices.[4] As a result, complaints were issued, consolidated and heard before an ALJ for several days in the spring of 1995.

During the course of the hearing, the General Counsel discovered two witnesses of whom it previously had been unaware, the SPURS. Burris and Adgerson appeared at the hearing and presented testimony that Sam's operations manager, Harris, had on several occasions made threats that Wal–Mart would close the store if the Union were voted in. According to Burris and Adgerson, Harris's threats were made in direct response to conversations with several of Sam's front-end employees about the benefits of Union membership. The General Counsel, after presenting the SPURS' testimony, moved for an amendment to the complaint to incorporate unfair labor practice charges stemming from Harris's unlawful threats of store closing. The ALJ allowed the amendment over Sam's objection and allowed Sam's additional time to defend against the new allegation.

After the hearing, the ALJ issued an opinion in which it determined that Sam's had violated §§ 8(a)(1) and (a)(3) of the Act[5] when: (1) Belthad threatened Porter that if the Union were victorious in the election the store would close; (2) a manager had discriminatorily disciplined Perez; and (3) Harris had threatened several employees that if the Union were successful in its election bid,

---

3. This action arises under § 10(f) of the Act and we do not have jurisdiction to review the election objections. *See* 29 U.S.C.A. § 160(f) (West 1973) (noting that the circuit courts of appeals may review only final orders of the Board pertaining to unfair labor practices).

4. The Union filed its first charge on April 28, 1994, alleging that Sam's had engaged in unlawful surveillance, suspended an employee for discriminatory reasons, suspended or altered the schedules of Union supporters, and threatened to close the club if the Union was voted in. On August 3, 1994, the Union filed a second charge, asserting that Sam's had discriminatorily disciplined several Union supporters and that Sam's had discriminatorily revoked the membership privileges of Union supporters. Finally, on November 14, 1994, the Union amended the second charge to include an allegation that Sam's had issued a low performance evaluation for a Union supporter and had threatened other workers with low evaluations should they vote for the Union.

The Regional Director evaluated these charges and, as an initial matter, issued a complaint based upon only one specific incident contained in the April 1994, charge—Belt's threat of store closing. Later, a complaint was also issued

based upon incidents described in the November 1994 amended charge.

The Union appealed the Regional Director's decision to the NLRB's office of appeals. As a result, an amended complaint was issued that included, *inter alia*, the allegation that Sam's management had unlawfully suspended Perez in retaliation for his Union membership, one of the charges initially filed in April 1994.

5. Section 8(a)(1) makes it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of" their right to engage in activities protected under § 7 of the Act. 29 U.S.C.A. § 158(a)(1) (West 1973 & Supp. 1998). Such activities include the "right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining." *See* 29 U.S.C.A. § 157 (West 1973 & Supp. 1998). Section 8(a)(3) makes it an unfair labor practice "to encourage or discourage membership in any labor organization" "by discrimination in regard to hire or tenure of employment or any term or condition of employment." 29 U.S.C.A. § 158(a)(3) (West 1973 & Supp. 1998).

Sam's would shut down.[6] As a result of these findings, the ALJ ordered Sam's to cease and desist from its illegal acts, remove from its personnel files any reference to Perez's unlawful discipline, and post a notice in the Landover Sam's. Sam's appealed the ALJ's decision to the Board. With only minor modifications, the Board affirmed the ALJ's opinion in all respects and adopted the ALJ's proposed order. Thereafter, Sam's filed the instant petition for review. The Board cross-petitions for enforcement of its order.[7]

Sam's petitions for review on several grounds. First, Sam's argues that the unfair labor practice findings relating to the actions of Belt and Perez are not supported by substantial evidence and should be overturned. Next, Sam's contends that the amendment of the complaint to incorporate a charge that Harris threatened employees violated § 10(b) of the Act. 29 U.S.C.A. § 160(b) (West 1973). Also, Sam's asserts that this amendment violated its right to fundamental fairness and due process. Further, Sam's asserts that if the amendment of the complaint was proper, the unfair labor practice finding stemming from the actions of Harris was not supported by the evidence presented at the hearing.

We reverse the Board's finding that Belt unlawfully threatened Porter because that conclusion is not supported by substantial evidence. Because the Board used faulty analysis in determining that Perez was the victim of anti-Union animus, and as a result the unfair labor practice finding is not supported by substantial evidence, we also reverse that unfair labor practice finding. Finally, because we agree with Sam's that the amendment of the complaint to include the charge that Harris threatened employees was improper, we reverse that unfair labor practice determination as well.

### III.

■ The Board's legal interpretations of the NLRA are entitled to deference. *See Holly Farms Corp. v. NLRB,* 517 U.S. 392, 116 S.Ct. 1396, 1406, 134 L.Ed.2d 593 (1996). If the Board's interpretations are "rational and consistent with the Act," they will be upheld by reviewing courts. *Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 42, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987). When we review mixed questions, the Board's application of legitimate legal interpretations to the facts of a particular case should be upheld if they are supported by substantial evidence based upon the record as a whole. *See id.; Beth Israel Hospital v. NLRB,* 437 U.S. 483, 501, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978). Likewise, the Board's factual determinations are "conclusive" if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C.A. § 160(e) (West 1973); *see also Universal Camera Corp. v. NLRB,* 340 U.S. 474, 493, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Substantial evidence is "more than a scintilla" but "less than a preponderance" of evidence. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *see also Allentown Mack Sales & Serv., Inc. v. NLRB,* 522 U.S. 359, ——, 118 S.Ct. 818, 823, 139 L.Ed.2d 797 (1998) (describing substantial evidence as enough evidence so that "on [the] record it would have been possible for a reasonable jury to reach the Board's conclusion")."Substantial evidence review is an objective assessment of the sufficiency of the evidence." *Pirelli Cable Corp. v. NLRB,* 141 F.3d 503,

---

**6.** The ALJ determined that the vast majority of the other pending unfair labor practice charges contained in the consolidated complaints were without merit. Aside from the unfair labor practice determinations challenged in this petition for review, the ALJ validated only one additional charge. The ALJ held that Sam's had violated § 8(a)(1) when a teamleader, Kim Upchurch, instructed an employee to limit her Union activities. Sam's does not appeal the Board's affir-

mance of this determination. Therefore, the portion of the Board's order pertaining to that unfair labor practice shall be enforced.

**7.** The Union is a party to this appeal as an Intervenor. It simply argues that the Board's determination of the issues before us was correct and therefore the Board's order should be enforced in all respects.

514 (4th Cir.1998) (citing *Allentown Mack*, 522 U.S. at ——, 118 S.Ct. at 828).

During the process of reviewing the entire record for substantial evidence, a reviewing court must not only consider the evidence used to support the Board's factual conclusion, but it also "must take into account whatever in the record fairly detracts" from the Board's fact-finding. *Universal Camera*, 340 U.S. at 487–88, 71 S.Ct. 456. "When the Board purports to be engaged in simple factfinding, . . . it is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." *Allentown Mack*, 522 U.S. at ——, 118 S.Ct. at 829. "Courts performing substantial evidence review, therefore, must examine whether the Board considered all of the reasonable inferences compelled by the evidence in reaching its decision." *Pirelli Cable Corp.*, 141 F.3d at 514.

An ALJ's credibility determinations should be accepted by the reviewing court absent exceptional circumstances. *See NLRB v. CWI of Maryland, Inc.*, 127 F.3d 319, 326 (4th Cir.1997). Exceptional circumstances include those instances when "a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." *Id.* (internal quotation marks omitted). Additionally, credibility determinations that are supported only by "generalized, conclusory statement[s] purportedly incorporating a host of individual comparative credibility determinations with respect to multiple witnesses" are not entitled to deference review. *Be–Lo Stores v. NLRB*, 126 F.3d 268, 279 (4th Cir.1997).

We review the Board's decision accordingly.

### IV.

Sam's first challenges the Board's determination that it violated § 8(a)(1) of the Act when supervisor Debra Belt threatened employee Danielle Porter that the Landover Sam's would be closed if the Union were successful (Porter–Belt incident). Sam's claims that this unfair labor practice finding is not supported by substantial evidence because its sole evidentiary support is an ex parte affidavit that was never entered into evidence during the hearing.

The Porter–Belt incident occurred on April 14, 1994, and was included in the Union's charges filed with the Regional Director on April 24, 1994. Shortly thereafter, on May 5, 1994, Porter made a sworn statement before representatives of the Board. In her statement, Porter reported: "I was talking to Deborah Belt . . . about getting a union. I told her that I hoped we would get a union or at least vote on it. She told me that's not what I wanted because Sam's would probably close the store because they didn't tolerate unions."[8] (J.A. at 179, testimony of Danielle Porter.)

During the hearing, which occurred approximately one year after the Porter–Belt incident transpired, Porter asserted that she herself raised the specter of Sam's closing in response to a successful Union organizing campaign. Porter said that during her conversation with Belt, she first stated that the Sam's might close if the Union won the election and that Belt simply agreed with her by saying that Porter was probably right. In response to Porter's testimony that Belt had not directly threatened her, but rather simply agreed with Porter's fears about the consequences of Union organization at Sam's, the General Counsel proceeded to impeach Porter with her prior sworn statement. The General Counsel invited Porter to explain why the 1994 affidavit differed from her hearing testimony. Porter revealed that the statement was the product of a question and answer process during which she was instructed "to just simply answer the questions" posed by a Board representative. (J.A. at 179.) Porter stated that she was asked only if any manager had spoken with her about the consequences of a Union victo-

---

8. Although the statement was not entered into evidence at the hearing and, therefore, is not part of the record on appeal, Danielle Porter read from lines 23–27 of the affidavit at the request of the General Counsel during her testimony. As a result, we must rely on the hearing transcript to determine the contents of the statement.

ry in the election, and that she responded that she and Belt had had such a conversation. Porter further explained that during the time her statement was taken she was never asked about the sequence of the conversation or who said what to whom. In sum, during the hearing Porter asserted that the affidavit accurately reflected the general contents of the conversation that occurred during the Porter–Belt incident, but that it did not accurately reflect the details of the interchange.

In her decision, the ALJ made a credibility determination and concluded that Porter's ex parte statement was more believable than her live testimony because at the time of the hearing she was still a Sam's employee and "was extremely reluctant to testify against her employer's interests." (J.A. at 125.) In light of that credibility determination, the ALJ found that Sam's had violated § 8(a)(1) of the act.

Sam's asserts that the ALJ erred in concluding that it had violated § 8(a)(1) based solely upon four lines from Porter's ex parte statement. Because the General Counsel never entered the affidavit into evidence during the hearing, Sam's argues that there was no evidence to support the ALJ's determination that it violated § 8(a)(1) and that therefore, the unfair labor practice finding was not supported by substantial evidence on the record as a whole.

We agree with Sam's that the § 8(a)(1) violation resulting from the Porter–Belt incident was not supported by substantial evidence and must be reversed. NLRB unfair labor practice hearings "shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure applicable for the district courts of the United States." 29 U.S.C.A. § 160(b) (1973). Applying the rules of evidence, Porter's affidavit, because it was never entered into evidence during the hearing, was properly used by the General Counsel as impeachment evidence only. Therefore, the ALJ was entitled to base only its credibility determination upon it. The statement was not entitled to substantive weight. *See Community Counselling Serv., Inc. v. Reilly*, 317

F.2d 239, 243 (4th Cir.1963) ("[T]he general rule is that ... [t]he pretrial statement is usable on cross-examination, for purposes of impeachment, to present earlier, contradictory statements, but it is not substantive evidence of the truth of the extra-judicial statements."). Thus, the ALJ erred when she used evidence included in the hearing only for impeachment purposes as substantive evidence that an unfair labor practice had occurred. *Cf. Michigan v. Harvey*, 494 U.S. 344, 353–54, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990) (noting the distinction between substantive evidence and impeachment evidence); *United States v. Leon*, 468 U.S. 897, 910, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (same). Because no other evidence supported the unfair labor practice determination, it must be reversed.

■ The law of evidence supplies ample explanation for this rule. Out-of-court statements used to support the truth of the matter asserted therein are, by definition, hearsay. *See United States v. Lewis*, 10 F.3d 1086, 1091 (4th Cir.1993). Technically, a presumption of unreliability applies to hearsay evidence. *See, e.g., United States v. Love*, 134 F.3d 595, 607 (4th Cir.1998) (discussing reliable hearsay); *United States v. Clark*, 18 F.3d 1337, 1342 (6th Cir.1994) (stating that out-of-court statements are presumptively unreliable). That presumption must be rebutted by a showing of reliability before the hearsay evidence can stand in support of a substantive proposition. *See* Fed. R. Evid. 801(d)(1) (providing that a prior inconsistent statement is not hearsay and therefore admissible if the witness is subject to cross-examination concerning the statement and the statement was made under oath subject to penalty of perjury at a trial, hearing, or other proceeding, or in a deposition). The General Counsel never made a motion to enter Porter's affidavit into evidence. As a result, Sam's never had an opportunity to contest the document's reliability and the ALJ never had a meaningful chance to examine that issue. Thus, the affidavit was never properly admitted as substantive evidence during the hearing and the ALJ's use of it as such was error. *See* Fed. R. of Evid. 105 (discussing the admission of evidence for limited purposes). *Cf. United States v. Ince*, 21

F.3d 576, 580 (4th Cir.1994)(discussing distinction between substantive and impeachment evidence); *Martin v. United States,* 528 F.2d 1157, 1160–61 (4th Cir.1975) (reversing conviction when impeachment evidence was erroneously used substantively).

Because the ex parte statement could not be used as substantive evidence, and the ALJ determined Porter's live statements were not credible, an evidentiary vacuum was created surrounding the Porter-Belt incident. There was simply no substantive evidence that Belt ever made a threatening statement to Porter. An unfair labor practice finding cannot be sustained when there is no substantive evidence supporting it,[9] and therefore we reverse the Board's determination that the Porter–Belt incident was a violation of § 8(a)(1) of the Act.[10]

## V.

■ Sam's next challenges the ALJ's conclusion, affirmed by the Board, that Perez was the victim of anti-union discrimination in violation of §§ 8(a)(1) & (a)(3) of the Act. Sam's argues that the ALJ's conclusion that Perez was unfairly disciplined twice for the same infraction was incorrect because the ALJ did not consider adequately the non-discriminatory reason for the second discipline that Sam's articulated at the hearing. We agree, and accordingly reverse.

■ The Board applies a shifting burden of proof to determine whether a discriminatory animus led an employer to discipline an employee in violation of § 8(a)(3) of the Act. *See NLRB v. CWI of Md., Inc.,* 127 F.3d 319, 330–31 (4th Cir.1997). First, the General Counsel must prove by a preponderance of the evidence that the employer was motivated, at least in part, by anti-union discriminatory intent when it made its decision to alter the employee's terms of employment.[11] *See id.* The General Counsel must demonstrate

**9.** It was suggested during oral argument that this exchange constituted substantial evidence:
> General Counsel: Well, Belt told you that Sam's didn't tolerate unions, isn't that right?
> . . . .
> Porter: Yes, I believe so.

(J.A. at 172.) When the context of Porter's entire testimony is examined, however, we disagree that this single statement that occurred as Porter struggled to explain to a hostile General Counsel the sequence of the conversation she had with Belt constitutes substantial evidence for the proposition that Belt threatened Porter. *Cf. Fieldcrest Cannon, Inc. v. NLRB,* 97 F.3d 65, 72 (4th Cir.1996) (noting the importance of context in evaluating evidence of unfair labor practices).

**10.** We need not address whether Porter–Belt incident was threatening or coercive in a manner cognizable under § 8(a)(1) because insufficient evidence was produced during the hearing to clarify whether Porter or Belt remarked that the store might close if the Union won the election.

**11.** We agree with the dissent that wholesale analogy to other areas of the law, specifically Title VII and First Amendment retaliation, is not always helpful in Board cases. In that vein, the term "mixed-motive" used by the dissent to describe the General Counsel's case, *post* at 208, is inapposite. Mixed-motive cases in other fields of law arise when an employer admits that considerations of the employee's race or protected speech, for example, contributed to the employer's decision, but the employer claims that because of other, legitimate considerations, it would have reached the same employment decision anyway. In a § 8(a)(3) case, in contrast, the employer need not concede wrongdoing. Rather, the General Counsel has the affirmative burden to prove by a preponderance of the evidence that anti-union animus motivated the adverse employment action. Thus, the § 8(a)(3) case is not the traditional mixed motive case as that term is generally understood in common legal parlance.

Falling back to an analogy to Title VII and First Amendment retaliation can elucidate, however, the hybrid burdens of persuasion and production borne by the parties in a § 8(a)(3) matter. In those other areas of the law, the Supreme Court has held that where mixed motives are implicated, once an employee has shown that her race or speech was not only some factor, as conceded by the employer, but was a "substantial" or "motivating" factor in her treatment, the burden shifts to the employer to prove "by a preponderance of the evidence that it would have reached the same decision as to [the employee] even in the absence of the protected conduct." *Mt. Healthy City Sch. Bd. of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471(1977). Thus, where mixed motives are involved, unlike situations in which the employer has denied any wrongdoing, both the burden of persuasion and the burden of production, shifts to the employer. In a mixed-motive situation, the employer has admitted that it considered illegitimate factors, and thus it is fair to put a heavier burden on the employer than it is when the employer denies any wrongdoing. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 271, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring). In contrast, discrimination cases in which the employ-

three elements to meet this requirement: (1) that the employee had been engaged in protected activity, (2) that the employer knew of the activity, and (3) that such activity was a substantial or motivating reason for the employer's action. *See id.* at 330; *ARA Leisure Servs., Inc. v. NLRB*, 782 F.2d 456, 462 (4th Cir.1986); *NLRB v. Daniel Construction Co.*, 731 F.2d 191, 197 (4th Cir.1984). Either direct or circumstantial evidence maybe used. *See NLRB v. Low Kit Mining Co.*, 3 F.3d 720, 728 (4th Cir.1993).

If the General Counsel can meet that burden by a preponderance of the evidence, the employer may nevertheless overcome the unfair labor practice charge if it can show that the terms of employment would have been affected even in the absence of union activity. *See ARA Leisure Servs., Inc.*, 782 F.2d at 462. "Thus, an employer might show that a worker's deficiencies, economic necessity, or a legitimate business policy compelled" disciplinary or other adverse action. *Id.*

 "When confronted with evidence of a legitimate business motive, General Counsel must prove by a preponderance of the evidence that union antipathy did actually play a part in the decision." *NLRB v. Instrument Corp. of America*, 714 F.2d 324, 327 (4th Cir.1983). In deciding what motivated the employer, the Board may not simply declare that the stated reasons for the disciplinary action are pretextual. Rather, the General Counsel must put forth substantial evidence that anti-union animus motivated the employer's choice. *See id.* at 327–28.

Perez was a member of the Union's organizing committee and from the record it is clear that Sam's had knowledge of that fact. The Board cites virtually no evidence, however, to support the conclusion that Perez's Union activity was a substantial or motivating reason for Sam's decision to issue Perez a "Day of Decision." The ALJ noted only the "arbitrary and vindictive" nature of the disciplinary action taken against Perez.

Even assuming that the evidence is sufficient to prove by a preponderance the General Counsel's initial burden that the suspension was motivated in part by anti-union discriminatory animus, which we doubt, we conclude that Sam's clearly met its burden of showing that it suspended Perez for one day with pay for a legitimate, non-pretextual reason. Perez was disciplined twice, once for each of two acts of insubordination. First Perez was insubordinate when he took his fifteen minute break despite being told by his supervisor to wait until another employee returned. Perez also was insubordinate when he refused to sign the counseling sheet or admit that his prior behavior regarding the break was improper. Clearly, Perez's refusal to follow the reasonable instructions of his manager was inappropriate behavior that had nothing to do with his Union activity. Therefore, Sam's met its burden of showing that Perez was disciplined for a legitimate reason.

 Under the Board's burden shifting procedure, the General Counsel must put forth concrete evidence that Sam's explanation was pretextual. *See Instrument Corp.,*

---

er has completely denied wrongdoing are governed by the McDonnell Douglas/Burdine framework, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668(1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207(1981), under which the employee has the burden of establishing a prima facie case, then the employer has the burden of presenting a legitimate, nondiscriminatory reason for its action, and finally the employee has the opportunity to show that the employer's explanation is merely a pretext. *See McDonnell Douglas*, 411 U.S. at 802–04, 93 S.Ct. 1817; *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The employee retains the burden of persuasion at all times. *See Hicks*, 509 U.S. at 506–07, 113

S.Ct. 2742. The employer merely has the burden of production once the employee has established a prima facie case. The employer does not have to prove that its actions were motivated by the legitimate, nondiscriminatory reasons; it need only state those reasons. *See Burdine*, 450 U.S. at 254, 101 S.Ct. 1089.

Clearly, the Board's approach to § 8(a)(3) claims does not fall neatly into either the "mixed-motive" or the *McDonnell Douglas/Burdine* approach. Both the General Counsel and the Employer bear affirmative burdens of proof and production on certain elements of the unfair labor practice claim. Like a *McDonnell Douglas* case, however, the employer admits no wrongdoing, and it is therefore appropriate that the General Counsel retain the ultimate burden of production and persuasion.

714 F.2d at 327–28. Here, the Board's apparent conclusion that Sam's explanation was pretextual is not supported by any evidence in the record.[12] It is unrebutted both that Perez first disregarded his manager's instruction to wait for a co-worker to return before taking his fifteen-minute break and then refused to sign the counseling form or admit that he had exercised poor judgment. The ALJ concluded that Perez was discriminatorily disciplined in violation of §§ 8(a)(1) and (a)(3) of the Act without applying the requisite shifting burden of proof scheme. She also improperly failed to assign the burden to the General Counsel to rebut Sam's evidence that it legitimately disciplined Perez for a second act of insubordination. Therefore, we reverse.

## VI.

Finally, Sam's challenges the Board's affirmance of the ALJ's decision to permit the General Counsel to amend the complaint during the hearing to include a charge that, while employees were conversing with the SPURS outside Sam's front entrance, the operations manager, Harris, had unlawfully threatened several employees that Sam's would close the store if the Union won the election (Harris allegation). The General Counsel's initial consolidated complaint made no reference to Harris; rather the Porter–Belt incident was the only instance of anti-Union threats referenced in the complaint. Sam's asserts that amending the complaint to include the Harris allegation violated § 10(b) of the Act.

Section 10(b), 29 U.S.C.A. § 160(b) (West 1973), operates as a statute of limitations on the filing of unfair labor practice charges. Under § 10(b), the charges incorporated in the complaint must be based upon events occurring within six months prior to the fil-

ing of a charge with the Board. *See id.* ("[N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board."). The purpose of § 10(b) is to assure a party that on any given day its liability under the Act is limited to incidents that occurred within the preceding six months. *See Local Lodge No. 1424 v. NLRB,* 362 U.S. 411, 419, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960).

■ Nevertheless, a complaint may be amended at any time prior to the issuance of a final order adjudicating the charges alleged in the complaint. *See* 29 U.S.C.A. § 160(b) ("Any such complaint may be amended ... at any time prior to the issuance of an order based thereon."). When an amendment is offered alleging new illegal activity not contained in the initial charges giving rise to the complaint, the acts alleged in the amendment must be "closely related" to the charges timely filed with the Board. *See FPC Holdings, Inc. v. NLRB,* 64 F.3d 935, 941 (4th Cir.1995); *accord Don Lee Distributor, Inc. v. NLRB,* 145 F.3d 834, 844 (6th Cir.1998); *Parsippany Hotel Management Co. v. NLRB,* 99 F.3d 413, 417 (D.C.Cir.1996).

■ Sam's first asserts that we should not reach the question of whether the Harris allegation and the Porter–Belt incident are "closely related." Sam's argues that the jurisprudence of § 10(b) requires that the facts underlying the proffered amendment occur *before* the action that comprises the factual underpinning of the timely filed charge. In this case, Sam's correctly notes that the Harris allegation arose from acts that occurred *after* the Porter–Belt incident. Therefore, Sam's contends that the Board exceeded its authority when it amended the complaint to include post-charge unlawful conduct.

12. The dissent's disagreement with our analysis here is largely semantic. Although we concede that we have used "legal catchwords like pretext," *post* at 208, we are in good company, as this court often addresses claims of discrimination under § 8(a)(3) using such terms. *See, e.g., Medeco Security Locks, Inc. v. NLRB,* 142 F.3d 733, 742 (4th Cir.1998); *Pirelli Cable Corp. v. NLRB,* 141 F.3d 503, 523 (4th Cir.1998); *NLRB v. Grand Canyon Mining Co.,* 116 F.3d 1039, 1047 (4th Cir.1997); *FPC Holdings, Inc. v.*

*NLRB,* 64 F.3d 935, 944 (4th Cir.1995); *Goldtex Inc. v. NLRB,* 14 F.3d 1008, 1012 (4th Cir.1994). In criticizing us for overcomplicating the analysis in this case, the dissent overlooks the factor that sets this matter apart from many others that have come before us—the Board never applied any discernible legal framework, burden shifting or otherwise, to this claim, and it is obvious that the ALJ did not understand or consider Sam's assertion of a legitimate business reason for imposing the Day of Decision disciplinary action.

Sam's argument is misplaced. In *NLRB v. Fant Milling Co.*, 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243 (1959), the Supreme Court examined the extent to which the Board may recognize events occurring after the filing of a charge upon which a complaint is based. Noting that the statute of limitations contained in § 10(b) does not apply "to conduct subsequent to the filing of the charge," *id.* at 309 n. 9, 79 S.Ct. 1179, the Court held that the Board could address unfair labor practices " 'which are related to those alleged in the charge and which grow out of them while the proceeding is pending before the Board,' " *id.* at 309, 79 S.Ct. 1179 (quoting *National Licorice Co. v. NLRB*, 309 U.S. 350, 369, 60 S.Ct. 569, 84 L.Ed. 799 (1940)). The Board is not, however, given "*carte blanche* to expand the charge as they might please, or to ignore it altogether." *Id.* (internal quotation marks omitted). Thus, for our purposes, the distinction Sam's is drawing between acts that occurred before the charge was filed and acts that occurred after the charge is filed is not meaningful.[13] In either case, the newly alleged unfair labor practice must be closely related to an allegation already contained in a timely filed charge.

▆▆▆ To determine whether a new factual allegation is closely related to the charges already raised, we have adopted the Board's test formulated in *Redd–I, Inc. v. Sheet Metal Workers International Association*, 290 NLRB 1115, *available in* 1988 WL 214320 (1988), and apply a three-factor analysis that examines:

(1) whether the allegations involve the same legal theory as the allegations in the charge, (2) whether the allegations arise from the same factual situation or sequence of events as the allegations in the charge, and (3) whether a respondent would raise the same or similar defenses to both allegations.

*FPC Holdings, Inc.*, 64 F.3d at 941. Here, factors one and three are not disputed. Both Sam's and the Board agree that the Porter–Belt incident and the Harris allegation involve the same legal theory—threats prohibited under § 8(a)(1) of the Act—and that Sam's was required to raise similar defenses to the two allegations. The question before us, therefore, is whether the two incidents "arise from the same factual situation or sequence of events." *Id.*

Sam's argues that the Porter–Belt incident and the Harris allegation are factually dissimilar in several significant ways: (1) the Porter–Belt incident took place behind closed doors as a private conversation between two co-workers whereas the Harris allegation transpired in the parking lot at the entrance to Sam's in front of several individuals;(2) Harris, Sam's operations manager, was a much higher ranking official than was Belt; (3) Harris made the anti-Union statements in front of Union organizers; and (4) Harris allegedly made threats of store closure on several separate occasions whereas Belt made a single threat.

▆▆▆ Two unfair labor practice allegations arise from the same factual situation or sequence of events when they demonstrate " 'similar conduct, usually during the same time period with a similar object.' " *NLRB v. Overnite Transp. Co.*, 938 F.2d 815, 820 (7th Cir.1991)(quoting *Redd–I, Inc.*, 290 NLRB No. 140, 1988 WL 214320 (1988)). A mere chronological relationship between the two events is not enough, *see Drug Plastics & Glass Co. v. NLRB*, 44 F.3d 1017, 1021 (D.C.Cir.1995), nor is it enough that the events simply occurred during the same union organizing campaign or reflected anti-union animus, *see id.* If, however, the two allegations are demonstrably part of an employer's organized plan to resist union organization, they are closely related. *See FPC Holdings, Inc.*, 64 F.3d at 941–42.

In *FPC Holdings*,[14] we determined that two unfair labor practice accusations arose

---

**13.** When a new unfair labor practice allegation arises from actions that took place prior to the filing of a charge, § 10(b) applies. Thus, the new allegation must not only be closely related to an incident already included among the timely filed charges, but also must have occurred within six months prior to the filing of the charge.

**14.** The dissent urges us to be guided by two additional cases addressing the propriety of late amendment to Board complaints, *NLRB v. CWI of Maryland, Inc.*, 127 F.3d 319 (4th Cir.1997), and *Rock Hill Telephone Co. v. NLRB*, 605 F.2d 139 (4th Cir.1979). Unfortunately neither case is

"from the same factual situation or sequence of events" when the actions were taken by the same managers against the same employees in response to the same catalyst. See id. at 942. In that case, two employees, DeCarlo and Zebeck, filed charges with the Board stating that their employer had committed an unfair labor practice when it terminated them for their union activities. See id. at 940. After investigating the charges, it came to light that prior to termination, DeCarlo and Zebeck had been threatened with termination after attending a union organizational meeting at a Big Boy Restaurant. See id. We held that the ALJ properly allowed amendment of the complaint to include a § 8(a)(1) charge incorporating the threats made prior to DeCarlo and Zebeck's termination.

This facts of this case are not at all akin to the facts of FPC Holdings.[15] In FPC Holdings, the new charge added in the complaint was the first step in the progression of events that resulted in the termination of two employees. The addition of the Harris charge is not similarly connected to those already contained in the complaint. Here, Harris and Belt are different managers with different levels of responsibility. Harris made his threats in public on several occasions to sizeable groups of several, largely unidentified, employees whereas Belt had only one single private conversation with Porter. Harris was not present during Porter's conversation with Belt and there is no allegation that Porter and/or Belt were present during Harris's statements. The Harris charge depicts a manager who would broadcast anti-union messages to all-comers in the parking lot of the store. Adding that charge to the complaint on the basis of an intimate conversation regarding private concerns about the possible consequences of unionization is like mixing apples with oranges. Those charges are not closely related.

Additional factual differences between the Porter–Belt incident and the Harris allega-

apposite. In CWI, we held that the Board's amendment of a complaint was proper because the underlying charge was filed well within the six month statute of limitations and therefore was timely. As a result of that holding, it was not necessary to consider whether the charge was closely related to those already in the complaint. See CWI, 127 F.3d at 327–28. A discussion of the closely related test was included as an alternative holding. See id. at 328 (noting that "[e]ven if the August 22 charge can be considered a 'new' charge" it falls within the closely related test). Even if we were bound by such dicta, which we are not, we find that the reasoning employed in that discussion is distinguishable from the case at hand. In CWI, we concluded that new charges are closely related to those already stated in the complaint when they elaborate the specific details of generally stated charges. Such is not the situation here where the Board has piggy-backed one specific charge upon another. Rock HillTelephone is also uninstructive. That opinion was issued long before the Board developed the Redd–I test and therefore applies an entirely different analysis from that adopted by this Circuit in FPC Holdings.

**15.** The dissent implies that we reach an absurd result in this case. It states that we have rewritten the requirements for amendment to NLRB complaints in this circuit and that henceforth any amendments to NLRB complaints must be identical to charges already contained therein. Certainly, such a requirement would not only be redundant but would also be nonsensical. Rather, we require only that the Board follow its own test for determining when amendments are appropriate. The Board has proffered a "closely related" test, and we have applied it. The "closely related" requirement was formulated with two competing purposes in mind. On one hand, the NLRB has a strong interest in fluid investigations that enable it to enforce the provisions of the Act. This is the interest emphasized by the dissent. On the other hand, however, employers who become subject to Board investigations have an equally important interest—notice and opportunity to be heard on the claims against them. Such are the hallmarks of due process. The dissent apparently prefers a new "tangentially related" test that gives undue emphasis to the interests of the Board. Under the dissent's formulation every unfair labor practice charge occurring during the course of a union organizing campaign (and presumably during a strike or any other organized union effort that might be opposed by management) is closely related to any other, although such a campaign may carry on for months and involve many different management actors at many different levels. The dissent, in effect, grants the Board unfettered power to amend the complaint at any point prior to the issuance of an order and disregards the Board's own requirement of factual similarity among charges. Such a reading of "closely related" grants the Board "carte blanche to expand the charge as [it] may please," NLRB v. Fant Milling Co., 360 U.S. 301, 309, 79 S.Ct. 1179, 3 L.Ed.2d 1243 (1959), and erodes the carefully crafted balance between the Board and employers that is essential to the fair administration of Board proceedings.

tion convince us that our conclusion that the two charges are not factually related is correct. The incidents did not occur during the same time period within the Union's organizing campaign. The Porter–Belt incident occurred early in April, just as the Union campaign was beginning. The Harris allegation occurred late in the Union campaign, during the last six weeks leading up to the election when the SPURS were at Sam's actively soliciting votes. Furthermore, there is no evidence on the record to support a conclusion that Sam's was pursuing an effort or crusade against the Union through illegal means. In fact, the record reflects that Sam's trained managers to prevent the occurrence of unfair labor practices.[16] Harris testified that he was trained through the use of a mnemonic device—SPIT (signifying the words "spy, promise, interrogate, threaten")—to avoid committing unfair labor practices during the election campaign. Kent Kramer, the general manager, testified that during the period of election activity Sam's stopped making discretionary promotions or pay increases to prevent the appearance of impropriety. Kramer also testified that Sam's relied on formal informational meetings to convey the company's perspectives on unionization to the employees. The informational meetings were attended, and sometimes interrupted, by pro–Union employees who were routinely given an opportunity to speak at the end of the meeting to share their views regarding the advantages of the Union.

As a result of the foregoing analysis, we conclude that the Porter-Belt incident and the Harris allegation were two discrete and insular occurrences over the course of the Union's organizing campaign. They have no significant factual relationship to each other. Therefore, the amendment of the complaint to include the Harris allegation was improper and we reverse.[17]

16. The dissent characterizes this discussion as "laud[ing] Sam's managers." *Post* at 210. This information is included, however, for the sole purpose of clarifying the undisputed record testimony.

17. Sam's also argues that the amendment violated its constitutional due process rights and that

## VII.

Based upon the previous discussion, we grant Sam's petition for review. We also grant the Board's cross-petition for enforcement in part and deny it in part.

*IT IS SO ORDERED.*

MICHAEL, Circuit Judge, dissenting:

Perhaps the most fundamental tenet of the National Labor Relations Act is that an employee's attitudes about and activities for or against a labor union are the employee's own business, and any action by employer or union that interferes with this freedom is unlawful. Indeed, this tenet is so fundamental and familiar that only its most unsavvy transgressors leave a trail of direct evidence of the transgression. Moreover, the sophisticated lawbreaker not only leaves few tracks but actively conceals them with ostensibly innocent explanations. It is the Board's job, and not ours, to ferret out these hidden trails. We have clearly and repeatedly endorsed the use of circumstantial evidence to prove unlawful motivation, and so long as this evidence is "substantial," the Board's assessment of its weight is conclusive. Consequently, I would, as I believe we must, enforce the Board's holding that the discipline of Perez was unlawfully motivated.

The impact of the majority's other error may prove far-reaching. The majority forbids the Board from amending a complaint except to include new conduct that is essentially identical to that alleged in the charge. The Supreme Court has held otherwise: "there can be no justification for confining [the Board's] inquiry to the precise particularizations of a charge," *NLRB v. Fant Milling Co.,* 360 U.S. 301, 308, 79 S.Ct. 1179, 3 L.Ed.2d 1243 (1959), and the power to inquire into related misconduct necessarily includes the power to redress it. Harris's plant closure threats were of the very same

the unfair labor practice finding is unsupported by substantial evidence. Because our holding that the amendment was not factually related to a timely filed unfair labor practice charge invalidates the amendment and, therefore, the unfair labor practice finding, we need not address either of these contentions.

character as those alleged in the charge, they occurred during the same organizing drive, and Sam's Club's defense to them (a simple denial) was precisely the same. Nevertheless, the majority holds that the evidence that the charge and the amendment are "closely related" is insubstantial as a matter of law. If this holding stands, the majority has wrought a sea change in the law.

I must respectfully dissent.

## I.

I first address the unfair labor practices the Board found in connection with the "day of decision" discipline meted out to Perez.

## A.

Subsections 8(a)(1) and (a)(3)[1] serve the Act's non-interference goal in slightly different ways. The former provision is a general interdiction of actions that "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" by § 7 of the Act.[2] It is violated when "(1) an employer's action can be reasonably viewed as tending to interfere with, coerce, or deter (2) the exercise of protected activity, and (3) the employer fails to justify the action with a substantial and legitimate business reason that outweighs the employee's § 7 rights." *Medeco Security Locks, Inc. v. NLRB*, 142 F.3d 733, 745 (4thCir.1998).

Subsection 8(a)(3) is a more narrowly focused protection of individuals' rights to seek and retain employment whatever their attitudes about unions or collective bargaining. An employer may not discriminate "in regard to hire or tenure of employment … to encourage or discourage membership in any labor organization." This provision prohibits blacklisting of union supporters and discriminatory discharge or discipline of them. *See*

*Medeco*, 142 F.3d at 741; *NLRB v. Frigid Storage, Inc.*, 934 F.2d 506, 509–10 (4th Cir. 1991). On the other hand, § 8(a)(3) does not establish a special preference for union members or grant them immunity from discipline; it prohibits only discrimination against them. An employer's valid hiring standards and work rules may be strict, but that does not implicate § 8(a)(3).

Thus, the General Counsel bears the burden of proving "by a preponderance of the evidence that union antipathy did actually play a part in the [employer's] decision[.]" *NLRB v. Instrument Corp. of America*, 714 F.2d 324, 328 (4th Cir.1983). Of course, this evidence need not be direct or conclusive.

> It goes without saying that because the task of proving an employer's motive is difficult, the Board may rely on circumstantial evidence presented by General Counsel in establishing that anti-union animus figured in the employer's actions, provided that the circumstantial evidence is substantial and the inferences drawn there from reasonable.

*Id.* at 328.[3] *See also Frigid Storage*, 934 F.2d at 510 (anti-union motive shown by timing of discharge, dubious explanation offered by employer, and employer's prior anti-union statements).

Moreover, I believe that the majority over complicates the Board's proof scheme, and, in doing so, fails to place a sufficient burden on Sam's Club. The General Counsel's burden of proof is always there: he must establish the existence of an illegal motivation by a preponderance of the evidence on the whole record. This showing may be relatively easy if the employer offers no facially legitimate reason for its action. Of course, the showing may be more difficult depending on the plausibility of the employer's explanation and the evidentiary support for it. *Medeco*, 142 F.3d

---

1. 29 U.S.C. §§ 158(a)(1), (a)(3).

2. 29 U.S.C. § 157. The section provides:

 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from

 any or all of such activities [subject to an exception not relevant here].

3. Circumstantial evidence is not necessarily inferior to direct evidence. "Some circumstantial evidence is very strong, as when you find a trout in the milk." Thoreau, *The Journal* (from entry for November 11, 1850)(reprinted in *The Heart of Thoreau's Journals* 40 (O. Shepard ed., Dover Pub.1961)).

at 742. But this possible increase in the General Counsel's "burden" is simply a function of the evidence and not something formally imposed by the law. Furthermore, I think it important to emphasize that the General Counsel satisfies his burden by showing a mixed motive: anti-union animus must not be "a substantial or motivating factor" in an adverse employment action. *NLRB v. CWI of Maryland, Inc.,* 127 F.3d 319, 331 (4th Cir.1997). *See NLRB v. Transportation Management Corp.,* 462 U.S. 393, 398–99, 103 S.Ct. 2469, 76 L.Ed.2d 667(1983) ("This construction of the Act—that to establish an unfair labor practice the General Counsel need show by a preponderance of the evidence only that a discharge is in any way motivated by a desire to frustrate union activity—[is] plainly rational and acceptable.").[4]

The employer bears no burden of proof until and unless the violation is proved, at which point it can, if it wishes, attempt to establish that the violation is harmless because it would have taken the same action at the same time even without the established illegal motivation.[5] *See Wright Line,* 251 N.L.R.B. 1083 (1980). It is not enough that the employer had some lawful motivation, even a predominant one. The lawful motivation must have been so great as to have assured the *same* result.

The majority does not appear to have held Sam's Club to this strict burden of proof. Instead, it posits that upon Sam's proffer of evidence of a legitimate reason for its actions, the burden shifts back to the General Counsel to prove "pretext."

That the majority would impose this additional burden on the General Counsel shows, at the very least, that it has not required Sam's to prove fully the *Wright Line* affirmative defense. Why? An employer that has proved by a preponderance of the evidence that it would have imposed the discipline at the same time and to the same degree for a legitimate, nondiscriminatory reason *has necessarily proved that its proffered reason is not, in whole or in part, pretextual.* If the ALJ finds that an adverse action would surely have taken place for a legitimate reason, there is nothing more to decide. An inevitable, legitimate reason cannot be a pretext. Only if the employer has *not* truly established the inevitability of lawful discipline could a pretext question remain viable, and, in my view, such an employer has lost its case.

This disagreement is not merely academic; it could determine the outcome in many, if not most, cases. The majority would require the General Counsel to establish, with the burden of proof, that a proffered reason is a mere "pretext." I believe that the law requires far less from the General Counsel. If the proffered reason, whether by being pretextual or legitimate but inadequate, would not have inevitably led to the discharge or the degree of discipline imposed, the employer's affirmative defense fails. Because the burden of proving the defense is on the employer, the General Counsel may offer evidence on the issue or may simply rely on the inadequacy of the employer's evidence. Moreover, if the General Counsel does offer evidence, he may assail the employer's case wherever it is weakest. He may choose to attack the credibility of the proffered nondiscriminatory reason; he may, as here, choose to attack the level or timing of the discipline that is justified by the proffered reason; or he may choose both. But he certainly need not prove that the proffered reason is wholly pretextual.

This is a mixed-motive case. The *Wright Line* affirmative defense is not even implicat-

---

4. For some reason, the Board generally refers to the General Counsel's burden of proof as a "prima facie case," which, through confusion with uses of that term in other contexts, has led to premature shifting of the burden of proof on less than the whole record. *E.g., CWI of Maryland,*127 F.3d at 330–32 & n. 7 (collecting cases expressing frustration at Board's terminology).

5. [P]roof that the discharge would have occurred in any event

and for valid reasons amount[s] to an affirmative defense on which the employer carrie[s] the burden of proof by a preponderance of the evidence. "The shifting burden merely requires the employer to make out what is actually an affirmative defense...."

*Transportation Management,* 462 U.S. at 400, 103 S.Ct. 2469 (quoting *Wright Line,* 251 N.L.R.B. at 1088 n. 11 (1980)).

ed unless the existence of an illegal motive is proved. The whole concept of "pretext" is ill suited to these cases, inasmuch as it implies "that the issue is whether either illegal or legal motives, but not both, were the 'true' motives behind the decision." *Transportation Management*, 462 U.S. at 400 n. 5, 103 S.Ct. 2469 (explaining why *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), is inapposite to the *Wright Line* analysis).

In sum, I believe that disparagement of circumstantial evidence and resort to cumbersome legal catchwords like pretext and the prima facie case serve only as ushers to error. The General Counsel has a straightforward case to prove: that an adverse employment action is "in any way motivated by a desire to frustrate union activity." *Transportation Management Corp.*, 462 U.S. at 398–99, 103 S.Ct. 2469. If he succeeds, the employer has a straightforward defense to prove: that the violation is harmless because it would have taken the same action at the same time. With this simple analytical framework in mind, I turn to the particular facts of this case.

### B.

Substantial, though largely circumstantial, evidence supports the Board's findings that the discipline given Perez for his unauthorized break was motivated in part by anti-union animus and that Sam's Club failed to prove that it would have imposed the same discipline absent the illegal motive.

Perez's pro-union activity was open and predated the purchase of the store by Sam's Club. When Perez made a pro-union remark at a company meeting, he was summoned to department supervisor Bill Black's office and warned to "tone down" his union activity. It was Black who meted out the discipline for Perez's unauthorized break, again advising Perez to "learn to respect . . . the people in charge here."

Notably, Perez's immediate supervisor, Davis, who had witnessed the misconduct, had prepared only a "performance coaching form," that is, a written reprimand under Sam's progressive discipline policy. Notwithstanding this decision, Black, along with general manager Kramer, stepped up the discipline to a one-day suspension, the harshest level short of outright termination. This escalation was not preceded by any inquiry into Perez's "side of the story," and when here turned, his attempts to tell his side of the story were assailed as yet more insubordination. He was "written up" once again and forced to sign the forms or be fired. The General Counsel also established that another employee had been treated more leniently than Perez for similar misconduct.

In sum, there is evidence that Perez was a union supporter, the company knew it, a company manager discouraged his union activity, the same manager imposed harsher discipline on Perez than his own supervisor had recommended, and a similarly situated employee was treated less harshly. This is evidence that "a reasonable mind might accept as adequate to support a conclusion" that anti-union animus played a role in the action taken against Perez and that the company would not have taken the same action for wholly permissible reasons. *See Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). Hence, it is substantial evidence. As a result, I would enforce the Board's order insofar as it holds that the treatment of Perez violated § 8(a)(1) as well as § 8(a)(3).

### II.

The majority's holding that the Board improperly amended the complaint blazes a new, and in my view misguided, path for our court. It is a path over which, I fear, we may trample the rightful powers of the Board.

### A.

The Board may amend a complaint "at any time before issuance of an order based thereon." 29 U.S.C. § 160(b). However, in order to preserve the integrity of the Act's six-month statute of limitations,[6] all alleged violations—be they in the original or an amend-

---

6. "[N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge[.]" 29 U.S.C. § 160(b).

ed complaint—must be "closely related" to those asserted in the charge and must have occurred within six months of the charge. *FPC Holdings, Inc. v. NLRB*, 64 F.3d 935, 941 (4th Cir.1995).

It should be beyond argument that new allegations need not be identical to the original ones. After all, the power to amend is the power to *change.* A "power" merely to repeat oneself or to add only inconsequential information would be a mockery of the word. Yet this bare pretense of power appears to be all the majority would suffer the Board to have.

### B.

This evisceration of the Board's authority is of great moment. The National Labor Relations Act was not passed for the private benefit of unions or employers; it was passed to protect commerce from the crippling effect of industrial strife. The Board enforces the law for the benefit of all of us.

On the other hand, Congress did not intend for the Board to intervene in a given workplace uninvited. As a result, it created the Labor Act's characteristic charge/complaint process. Upon the filing of a timely charge, the Board obtains the power to investigate and, if the public interest requires, to file a complaint. However, the Board is not unduly hamstrung by the terms of the charge.

> A charge filed with the Labor Board is not to be measured by the standards applicable to a pleading in a private lawsuit. Its purpose is merely to set in motion the machinery of an inquiry. The responsibility of making that inquiry, and of framing the issues in the case is one that Congress has imposed upon the Board, not the charging party. To confine the Board in its inquiry and in framing the complaint to the specific matters alleged in the charge would reduce the statutory machinery to a vehicle for the vindication of private rights. This would be alien to the basic purpose of the Act. The Board was created not to adjudicate private controversies but to advance the public interest in eliminating obstructions to interstate commerce, as

this Court has recognized from the beginning.

> Once its jurisdiction is invoked the Board must be left free to make full inquiry under its broad investigatory power in order properly to discharge the duty of protecting public rights which Congress has imposed upon it. There can be no justification for confining such an inquiry to the precise particularizations of a charge.

*Fant Milling Co.*, 360 U.S. at 307–08, 79 S.Ct. 1179 (citations and footnote omitted). On the other hand, the Board does not have "carte blanche to expand the charge as [it] may please," *id.* at 309, 79 S.Ct. 1179, because "any allegations which eventually turn up in a complaint must be, as a threshold requirement, the product of the investigation triggered by a charge." *Speco Corporation*, 298 NLRB 439, 440 (1990). The Board refers to such "product of the investigation" claims as "closely related" ones.

### C.

We have approved the Board's use of a three-factor test to determine whether the new and old claims are "closely related": whether the new allegation and charge allegation (1) involve the same legal theory, (2) arise from the same factual circumstances or sequence of events, and (3) call for the same or similar defenses. *FPC Holdings*, 64 F.3d at 941 (citing *Redd–I*, 290 NLRB 1115, 1118 (1988)).

> [A]llegations are closely related when they are "part of an overall plan to resist organization[,] ... whether or not the acts are of precisely the same kind and whether or not the charge specifically alleges the existence of an overall plan on the part of the employer."

*FPC Holdings*, 64 F.3d at 941 (quoting *Waste Management of Santa Clara Co., Inc.*, 308 NLRB 50 & n. 2, 1992 WL 186632 (1992)).

The issue is a mixed question of law and fact. Our *FPC Holdings* case establishes the legitimacy of the Board's legal standard, so the Board's conclusion that charges are "closely related" must be affirmed if it is supported by substantial evidence. *Don Lee*

*Distributor, Inc. v. NLRB,* 145 F.3d 834, 845 (6th Cir.1998); *see Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 42, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987). I believe that it is.

### D.

Both the charge and the original complaint alleged that Debra Belt, a Sam's Club manager, told employees that the company does not tolerate unions and that it might close the store if the union won the election. In the amended complaint, the General Counsel added an allegation that Stan Harris, a manager of higher rank than Belt, repeatedly warned union organizers, within earshot of employees, that the company is so "powerful" that it "would never be organized by any union" and "would close down before [the union] would ever get a contract." Thus, the amended complaint asserted that two managers made essentially the same coercive statements during the same organizing drive in the presence of members of the same proposed bargaining unit. I suppose it is possible that these events were wholly unrelated and that their coincidence was mere happenstance. But surely the Board's conclusion otherwise was supported by substantial evidence, and we ought to defer to it.

### E.

There is no deference to be had today. The linchpin of the majority's holding is its own finding that "there is no evidence on the record to support a conclusion that Sam's was pursuing an effort or crusade against the Union through illegal means," ante at 205. The majority lauds Sam's managers, including Harris himself, for their training and efforts in preventing unfair labor practices. These factual findings areas baffling as they are improper under the standard of review. The Board *found* that Harris, the operations manager of the store, threatened to close the store if the organizing drive was successful. Such actions by a high-ranking manager support a reasonable inference that other coercive incidents involving lower-ranked managers (for example, the warnings to and discriminatory discipline of Perez) were indeed a manifestation of the true attitude of Sam's management in general.

The four "dissimilar[ities]" between the Harris and Belt allegations listed by Sam's Club (and highlighted by the majority) are inconsequential. *See* ante at 203. Coercive threats are coercive threats, whether they are communicated through a whisper, over a loud-speaker, or by Morse code. As I mentioned above, Harris's high rank and brazenness in making repeated threats in public and in front of union organizers make it more, and not less, likely that the coercive actions of lower level managers were related actions rather than products of individual initiative.

We have certainly upheld similar amendments in the past. For example, in *Rock Hill Telephone Co. v. NLRB,* 605 F.2d 139, 142 (4thCir.1979), we held that an amendment was proper simply on the basis that "all of the allegations ... concern the Company's response to the Union's organizing effort." In *FPC Holdings* the employer reprimanded employees for meeting to "discuss pay" at a restaurant during lunch. These employees later decided to seek union representation; soon thereafter, two of them were fired. The original complaint alleged only that the terminations were unlawful, but at the hearing the complaint was amended to assert a § 8(a)(1) violation arising from the reprimands. We upheld the Board's conclusion that the violations were "closely related." Finally, in *NLRB v. CWI of Maryland, Inc.,* 127 F.3d 319, 328 (4th Cir.1997), the charge stated simply that, during an organizing drive, the employer "made threats and promises to its employees to destroy their rights under the act." The complaint went much further, detailing three categories of threats made by the employer's president. We held that because the specific allegations involved the same legal theory, arose from the same sequence of events, and called for the same legal defenses, they were "closely related" to the general one asserted in the charge.

There is a common thread here. *Rock Hill, FPC Holdings,* and *CWI of Maryland* recognize that a union organizing campaign is just that—a campaign, and not simply a

series of random, uncoordinated incidents. Likewise, an employer's campaign against organization, be it lawful persuasion, unlawful coercion, or some combination of both,is a sequence of closely related events. *See Don Lee,* 145 F.3d at 845 (complaint based on charge of refusal to bargain in good faith related to "entire course of collective bargaining" and could be amended to include new allegations of employer misconduct during that course); *Truck Drivers & Helpers Union, Local 170 v. NLRB,* 993 F.2d 990, 1001 (1st Cir.1993) ("It is sufficient that both charges are part of the same effort or crusade against the union."); *NLRB v. Overnite Transportation Co.,* 938 F.2d 815 (7th Cir. 1991) (threats during successful organizing campaign and subsequent refusal to bargain were part of single anti-union crusade; amendment permitted). Today this common thread is cut.

### III.

Because I would permit the amendment of the complaint, I must address whether the Board's finding that Harris violated § 8(a)(1) by threatening to close the store is supported by substantial evidence.[7] I easily conclude that it was.[8] First of all, there is no doubt that the statements, if made, violated the Act. *See NLRB v. Grand Canyon Mining Co.,* 116 F.3d 1039, 1044 (4th Cir.1997); *Nueva Engineering,* 761 F.2d at 966. The only issue is the factual one: whether the threats were made. Burris and Adgerson each testified that they were; Harris and George Fassitt (a Sam's co-manager who often accompanied Harris) testified that they were not. The ALJ chose to believe the former, and the witnesses' comparative demeanor played a central role in her decision:

[T]hese women [Burris and Adgerson] spoke simply, directly and without affectation. They could have attributed a host of unlawful statements to a wide number of

management officials, but they pinpointed Harris, whose duties admittedly put him in their path on a daily basis.

In contrast to Adgerson's and Burris' unassertive demeanor, Harris appeared to be an extroverted, confident individual who would have little hesitation in attempting to impress two unsophisticated union volunteers with the power of his employer.

Credibility determinations must be accepted by a reviewing court absent "exceptional circumstances." *NLRB v. Air Products and Chemicals, Inc.,* 717 F.2d 141, 143 (4th Cir. 1983). "Exceptional circumstances" include a credibility determination that is "is unreasonable, contradicts other findings of fact, or 'is based on an inadequate reason or no reason at all.'" *NLRB v. McCullough Environmental Services, Inc.,* 5 F.3d 923, 928 (5th Cir.1993) (citation omitted) (quoted in *Fieldcrest Cannon, Inc. v. NLRB,* 97 F.3d 65, 69–70 (4th Cir.1996)). The ALJ's findings here are unassailable under this standard.

I would enforce the order of the Board.

---

7. The continuance granted to afford Sam's Club ample time to prepare its defense renders its assertion of a denial of due process untenable.

8. Because the effect of the cease and desist order would be the same whether this § 8(a)(1) violation was established by Harris's threats, the Porter–Belt incident, or both, I would not reach whether substantial evidence supported the ALJ's finding that Belt had in fact made the statements

attributed to her in Porter's affidavit. While I cannot dispute the majority's recitation of the rules of evidence, the ALJ saw something in Porter's demeanor that we cannot readily appreciate from here, specifically, she was "as reluctant' a witness as one could find." The ALJ feared, with justification, that Sam's Club might escape responsibility for coercive conduct because of the very effectiveness of the coercion.