**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 05-2289**

---

INTEGRATED ELECTRICAL SERVICES, d/b/a Primo
Electric,

Petitioner,

versus

NATIONAL LABOR RELATIONS BOARD,

Respondent.

-------------------------------

LOCAL 24, INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, AFL-CIO,

Intervenor.

---

**No. 05-2411**

---

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

versus

INTEGRATED ELECTRICAL SERVICES, d/b/a Primo
Electric,

Respondent.

-----------------------------

LOCAL 24, INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, AFL-CIO,

                                        Intervenor.

-----------------------------

On Petition for Review and Cross-application for Enforcement of an
Order of the National Labor Relations Board.  (5-CA-31829)

-----------------------------

Argued:  November 28, 2006          Decided:  February 13, 2007

-----------------------------

Before WILKINSON, MOTZ, and GREGORY, Circuit Judges.

-----------------------------

Petition for review denied; cross-application for enforcement
granted by unpublished opinion.  Judge Gregory wrote the opinion,
in which Judge Wilkinson and Judge Motz joined.

-----------------------------

**ARGUED:** Douglas Michael Nabhan, WILLIAMS MULLEN, Richmond,
Virginia, for Integrated Electrical Services, d/b/a Primo Electric.
Jeffrey Lawrence Horowitz, NATIONAL LABOR RELATIONS BOARD,
Washington, D.C., for the Board.  Gabriel Antonio Terrasa,
SINGLETON, GENDLER & TERRASA, Owings Mills, Maryland, for Local 24,
International Brotherhood of Electrical Workers, AFL-CIO,
Intervenor.  **ON BRIEF:** Heath H. Galloway, WILLIAMS MULLEN,
Richmond, Virginia, for Integrated Electrical Services, d/b/a Primo
Electric.  Ronald Meisburg, General Counsel, John E. Higgins,
Deputy General Counsel, John H. Ferguson, Associate General
Counsel, Aileen A. Armstrong, Deputy Associate General Counsel,
Julie B. Broido, Supervisory Attorney, NATIONAL LABOR RELATIONS
BOARD, Washington, D.C., for the Board.

-----------------------------

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

Integrated Electrical Services, Inc., d/b/a Primo Electric ("Primo") appeals a National Labor Relations Board ("NLRB" or "Board") decision that it violated the National Labor Relations Act ("the Act") by terminating William Hughes because of his protected union activity. The NLRB brings a cross-appeal for enforcement of the Board's order that Primo reinstate Hughes and pay his back wages and benefits. Because substantial evidence supports the Board's conclusion that Primo engaged in unfair labor practices in violation of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(a)(1) and (3) (2000), we affirm the ruling of the Board and grant the petition for enforcement.

I.

A.

In 2003,[1] William Hughes, a licensed master electrician, went to the Local Hall of the International Brotherhood of Electrical Workers, AFL-CIO, in Baltimore, Maryland, to see if the union could help him find work. In June or July and still significantly low on the job list, Hughes decided, after prompting by union officer Roger Lash, to apply for a job at Primo Electric in part so that he could attempt to organize Primo electricians and influence Primo to

---

[1]All the events described took place in 2003 unless specifically designated otherwise.

3

become a union contractor. Hughes attended classes at the union hall to learn effective and lawful salting techniques. He learned that he should keep a daily log on the job and that he should not hand out union literature during working time or at the work site.

Primo hired Hughes, and he began working on August 11. From August 12 to August 18, he installed lights and did other electrical work at the Naval Academy grounds in Annapolis, Maryland. On August 19, Primo transferred him to another job at the Navy football stadium, where he installed fluorescent lighting, heaters, and air conditioners. On August 26, he did not come to work, nor did he call to explain his absence. On August 27, he returned to the stadium wearing his union t-shirt. The shirt said "Union Yes" and depicted the Local 24's logo on the front. J.A. 705. The back had a larger logo that included the statement, "Ask me about my union," the IBEW seal, a phone number, and the phrases, "family health care," "paid retirement," "higher wages," and "job safety." J.A. 706. When he saw the union shirt, Hughes's foreman, Mike Gunzelman, told Hughes that he needed to remove the shirt and put on a Primo shirt. Hughes refused to do so, and Gunzelman sent him home.

Gunzelman did not know that Primo's dress code only applied to workers in the service department, who were required to wear Primo shirts because they interacted with customers. At 8:15 that morning, Hughes received a telephone call from a woman at Primo.

4

She apologized for his having been sent home, told him that he would be paid for the work day, and assured him that he could wear his union shirt whenever he chose. She also told him to report to work the next day at the Naval Academy grounds.

Hughes returned to work at the Naval Academy on August 28. He wore his union shirt to work every day thereafter. On September 2, Hughes was digging a trench with a Ditch Witch. One of his co-workers alerted him to markers that indicated that he was digging in the vicinity of a high voltage wire. When he informed his foreman, Chip Grady, about the danger, Grady instructed him to dig the trench by hand. Hughes reported this incident to Lash, who called OSHA to inspect the potentially dangerous situation. On September 3, OSHA inspectors came to the job site, inspected the area, spoke with Primo supervisors, and instructed Hughes to use only a shovel and not a digging bar when digging the trench. Primo received no OSHA citation for this incident.

On September 3, Primo Human Relations Director Darcia Perini called Hughes into the office to inquire about the job experience listed on his application. Perini then had Hughes meet with several managers, who interviewed him for one or more office positions, including that of Job Estimator.[2] At the conclusion of these conversations, Perini asked Hughes if he would be interested

---

[2]As the proprietor of his own electrical business for several years, Hughes had significant experience in making estimates for the types of jobs Primo did.

in any of the office positions. Hughes responded negatively, saying that he liked to work with his tools and that his talents would best serve Primo in the field. Hughes returned to his work at the Naval Academy until he was transferred again on September 5, this time to Andrews Air Force Base ("AAFB").

After a little under a month, Hughes's time at AAFB became eventful.[3] On September 28, Hughes was working when Eric Gray, a man Hughes recognized as a backhoe operator, approached Hughes with instructions. Stating that he only took orders from his foreman, Dale Haylett, Hughes refused to obey Gray. Gray had taken over for Haylett in his absence, but Hughes claimed not to have known that fact at the time. On the next day, Hughes took offense at the words of another backhoe operator, Joe Schlerf, and responded in kind.[4] Schlerf approached Hughes and exclaimed that someone ought to get him off the job. Nothing more came of the incident, but

---

[3]Hughes claimed in testimony that little of the work he did at AAFB was electrician's work and that he spent most of his time shoveling and raking.

[4]The crew was laying concrete in a form. Hughes's job was to operate the concrete vibrator, a long tube attached to a motor. The vibrator, known in construction slang as a "dick," spread the concrete around in the form to help make it even and keep it liquid until the form was filled. While waiting for another worker to finish raking the concrete around him, Hughes held the vibrator in the air, not in the concrete. Schlerf, who had been operating the concrete dispenser, noticed the position of the vibrator and yelled at Hughes to "stick your dick in the concrete." Hughes, not knowing the slang term for the equipment, took offense at the comment and shouted back to Schlerf that he would stick it in his ear. J.A. 931.

6

Hughes typed a report of it, verified the report with witnesses, and gave it to his superiors. On October 2, Haylett accidentally ran over Hughes's lunch and tool boxes with a bulldozer. Primo replaced the tools on October 3.

During September and October, Hughes increased his salting activity at Primo. Throughout September, he spoke with his fellow employees about the union and the benefits it might offer them, and he reported in his daily log that his co-workers seemed to have no problem with his union affiliation and that some even seemed interested in the union. At some point during that month, Lash gave Hughes some CD-ROM/DVDs that outlined the wages a union electrician could expect to receive. Hughes kept these CD-ROMs in the front seat of his car and on September 30, he gave two of them to co-workers in the parking lot before work. He handed out two more the next day at the same time.

Hughes claims he gave a CD-ROM to Clayton Bester, either before or after work. Bester handed the CD-ROM over to Primo officials, who reported the exchange to Perini.[5] The supervisor

_____

[5]Primo's employee handbook has a no-solicitation policy. The policy states:

> Solicitation for any cause during working time and in working areas is not permitted. You are not permitted to distribute non-Company literature in work areas at any time during working time. Working time is defined as the time assigned for the performance of your job and does not apply to break periods and meal times. Solicitation during authorized meal and break periods is permitted so long as it is not conducted in working areas.

7

Keith Hogge then requested that Bester make a written statement. Bester's statement, dated September 24, 2003, at 8:30 am, identified Ernest Bringas as a witness and stated: "We were backing filling swith [sic] pads when Bill talk [sic] to me about. That is when he gave me the disc." J.A. 806. On October 10, Perini and Richard Stiles came to AAFB to interview Bester and Hughes. Bester claimed that Hughes had given him the CD-ROM on the job site during working time. When Perini confronted Hughes with the allegation that he had violated the company's no-solicitation policy by distributing the CD-ROM during working time, Hughes demanded to know the name of his accuser. Perini refused to tell him Bester's name and also refused to show him Bester's statement. Hughes denied the allegations, and Perini informed him that they were terminating him for lying.[6]

### B.

On March 24, 2004, the union filed an unfair labor practices claim against Primo with the NLRB. During the hearing before the Administrative Law Judge ("ALJ"), Hughes testified that he had been a hard worker, his foremen treated their workers badly, he was assigned laborers' work of digging dirt after he wore his union t-shirt, and he had never given out union materials on the job site

---

J.A. 784.

[6]Primo's handbook lists dishonesty as an offense warranting discipline or termination.

or during working time.  He also testified that a couple of days before he was fired, Bringas warned him that he might be fired because someone was telling the bosses that he was handing out material during working hours.  Hughes had some trouble on the stand remembering minor details and recognizing Bester as someone to whom he had given a CD-ROM.  He only remembered Bester and the details of their interaction after Bester had testified.

Primo's witnesses painted an entirely different picture. Primo's management testified that Hughes was a slow, lazy worker, who spent more time smoking than working.  They testified that Hughes was a troublemaker and that they had plenty of reasons to discharge him beyond their claimed reason of dishonesty.  Perini admitted that she informed the company president or vice president when Primo took any action regarding Hughes.  Primo's witnesses testified inconsistently about the circumstances surrounding Hughes's distribution of the CD-ROM to Bester and Bester's cooperation with Primo officials.  The company's stated anti-union policy did not help its case.[7]

---

[7]The policy reads:

> Primo does not have a union; therefore, no one is required to be a member of a union to work here. Employees have been satisfied with this arrangement. There is no discrimination because a person is or is not a union member.

> All employees are treated fairly, and an employee who is now a member or becomes a member of a union in the future should expect no more than an employee who is not a union

9

Primo attempted to demonstrate that it treated similarly situated employees consistently by presenting evidence that since Hughes's termination, it has fired several people for dishonesty. In those cases, Perini admitted that she did more extensive investigations than she did in Hughes's case, even speaking with witnesses involved. The one pre-Hughes case Primo used to disprove disparate treatment lacked force because the original official reason for termination did not match the reason Perini gave on the stand. The reasons given to the employee, written in the employee

---

> member. Unions have provided none of the salaries and benefits at Primo, and it is not expected that they will help improve any benefits in the future. What the future can be and the success that will come will depend on what each employee does, individually and collectively, with his or her opportunities.
>
> Solicitation will be allowed consistent with Primo's policy as reflected in Section 10.8 of this Handbook. However, intimidation or coercion of any employee for any reason will not be condoned. Primo will resist any efforts to bring a union into the Company by all legal means at its disposal.

J.A. 791.

Primo's handbook also states:

> Employees must refrain from taking part in or exerting interest in any transaction in which their own interests may conflict with the best interests of the Company. Primo reserves the right to determine when an employee's activities represent a conflict with the Company's interest and to take whatever action is necessary to resolve that situation, including termination of employment.

J.A. 782.

10

file, and stated to the unemployment board included gross misconduct, negligence, and unsatisfactory job performance. Only on the stand in Hughes's case did Perini claim that the actual reason was the employee's dishonesty.

The ALJ credited Hughes's testimony over that of the Primo witnesses and found that Primo had been motivated by anti-union animus when it fired Hughes. He cited as evidence of that animus Primo's decision to move Hughes away from other electricians after he started wearing his union t-shirt, its attempt to offer Hughes a job that would pull him out of the field, and its stated anti-union policy. The ALJ further concluded that Primo's allegedly legitimate reason for firing Hughes—dishonesty during the investigation—was pretextual. He took particular notice of the lack of investigation by Perini: she never attempted to speak with the named witness, Bringas, nor did she name Hughes's accuser, despite the fact that in prior sexual harassment investigations she had always told the alleged culprit the name of his accuser. The ALJ also pointed out that Primo could not refute a disparate impact claim with its inconsistent evidence. He relied on Hughes's credited testimony that before Perini had asked Hughes any questions she told him that he was being terminated.

The ALJ concluded that Primo had violated 29 U.S.C. §§ 158(a)(1) and (3) by firing Hughes because of his union activities. He ordered Primo to cease and desist from its unfair labor

11

practices, to reinstate Hughes and make him whole, to remove any mention of the termination from its files, and to post the required notice. Upon receipt of this order, Primo filed exceptions with the Board.

The Board affirmed the ALJ's decision. Primo argued that the decision should be overturned because the ALJ relied mainly upon a piece of evidence that he erroneously admitted in violation of the attorney-client privilege.[8] Concluding that sufficient evidence existed exclusive of that statement to support the ALJ's decision, the Board declined to rule on the admissibility of the statement. The Board also relied on the ALJ's credibility determinations.

Primo has appealed the Board's ruling to this Court. The NLRB has filed a cross-appeal, seeking enforcement of the Board's order.

---

[8]The ALJ had admitted testimony by Bester that in preparation for the hearing, Primo's attorney told Bester that Primo fired Hughes for distributing the CD-ROM on company time. Bester testified:

> That he gave me that illegally, you know, he wasn't supposed to give it to me during company time and that Bill had got fired and he was suing the company or something to that nature. And he's saying that because he gave that to me on company time.

J.A. 390.

12

We will enforce a Board order under the National Labor Relations Act if "substantial evidence on the record considered as a whole" supports the ALJ's factual findings and if the ALJ applied the law to the facts in a manner both "reasonable and consistent with the act."  29 U.S.C. § 160(e); Grinnell Fire Protection Sys. Co. v. NLRB, 236 F.3d 187, 195 (4th Cir. 2000).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Diesel Co. v. NLRB, 263 F.3d 345, 351 (4th Cir. 2001) (citations and quotation marks omitted).  We must "accord due deference to the reasonable inferences that the Board draws from the evidence." Grinnell, 236 F.3d at 195.  If substantial evidence exists to support an NLRB decision, we "must uphold the Board's decision even though we might have reached a different result had we heard the evidence in the first instance." Consol. Diesel, 263 F.3d at 351.

In determining whether substantial evidence exists, we defer to the credibility findings of the ALJ unless faced with "extraordinary circumstances." NLRB v. Transpersonnel, Inc., 349 F.3d 175, 184 (4th Cir. 2003).  The ALJ is in the best position to judge the credibility of the witnesses who appear before him or her:  "The balancing of witnesses' testimony is at the heart of the factfinding process, and it is normally not the role of the reviewing court to second-guess a fact-finder's determinations

about who appeared more 'truthful' or 'credible.'" Fieldcrest Cannon, Inc. v. NLRB, 97 F.3d 65, 71 (4th Cir. 1996). Extraordinary circumstances sufficient to overturn an ALJ's credibility determination exist in "those instances when 'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.' " Sam's Club v. NLRB, 173 F.3d 233, 240 (4th Cir. 1999) (quoting NLRB v. CWI of Md., Inc., 127 F.3d 319, 326 (4th Cir. 1997)).

III.

The National Labor Relations Act protects employees who seek to form unions or participate in union activities. Section 8 of the Act protects the rights of employees by making it an unfair labor practice for an employer:

> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; . . .
>
> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ;

29 U.S.C. § 158. The NLRB has enforcement jurisdiction for these sections of the Act. 29 U.S.C. § 160.

14

To succeed on an unlawful termination claim under Section 8,[9] the employee must make a prima facie case that the employer's decision to fire him or her was motivated by anti-union animus. FPC Holdings, Inc., v. NLRB, 64 F.3d 935, 942 (4th Cir. 1995). The NLRB, on behalf of the employee, must show:

(1) that the employee was engaged in protected activity,[10]
(2) that the employer was aware of the activity, and
(3) that the activity was a substantial or motivating reason for the employer's action.

Id. The employer's motive for termination is the key element in these types of cases.

Because proving discriminatory motivation is a difficult task, the Supreme Court has approved a burden-shifting proof process known as the Wright Line test for mixed-motive cases. See NLRB v. Transp. Mgmt. Corp, 462 U.S. 393, 403 (1993) (approving the burden-shifting scheme of Wright Line, 251 N.L.R.B. 1083 (1980)). To make a prima facie case of unlawful termination, the NLRB must prove by a preponderance of the evidence "that a discriminatory motive was a substantial motivating factor" in the termination decision. RCG (USA) Mineral Sands, Inc. v. NLRB, 281 F.3d 442. 448 (4th Cir.

---

[9]Proving that an employer violated 29 U.S.C. § 158(a)(3) also proves a derivative violation of § 158(a)(1). Metropolitan Edison Co. v. NLRB, 460 U.S. 693, 698 n.4 (1983).

[10]The Supreme Court has held that distributing union materials in non-working areas during non-working times is a protected activity under Section 7 of the Act. Beth Israel Hosp. v. NLRB, 437 U.S. 483, 491-93 (1978).

2002) (citing CWI, 127 F.3d at 331)).  The burden then shifts to the employer "to prove affirmatively that the same action would have been taken even in absence of the [applicant's] union activity."  Id. (citing FPC Holdings, Inc. v. NLRB, 64 F.3d 935, 942 (4th Cir. 1995)).  The ALJ should scrutinize the reasons given by the employer, and "[i]f the [judge] believes the employer's stated lawful reasons are non-existent or pretextual, the defense fails."  USF Red Star, Inc. v. NLRB, 230 F.3d 102, 106 (4th Cir. 2000).

IV.

This case turns on the credibility of the witnesses.  If we do not find extraordinary circumstances sufficient to overturn the ALJ's credibility determinations, we should find that substantial evidence supports the Board's decision that anti-union animus motivated Primo's termination of Hughes and that the stated reason of dishonesty is mere pretext.  The record demonstrates that both sides suffered from inconsistency in their testimony.

Hughes had difficulty remembering certain details of his experience at Primo.  He had trouble recognizing and identifying Bester.  He mistakenly claimed that Perini had given him his final paycheck at the termination meeting on October 10, then changed that testimony on cross-examination, explaining that his wife had reminded him that he had received that check in the mail.  He could

16

not remember missing work on August 26, and he could not remember a job he held prior to working at Primo.

The testimony of the Primo witnesses also suffered from inconsistencies. Most striking were the differences in the stories surrounding Hughes's termination. Bester testified that he walked in on a conversation between Hogge and Schlerf in which the two were discussing Hughes's distribution of union materials. He claimed that they asked him if he had a CD-ROM and then asked him to bring it to them. Bester had to retrieve the CD-ROM from his trash at home. Hogge testified that Bester had come to him with the CD-ROM of his own accord. Schlerf testified that Bester had approached him in the field about the CD-ROM, and Schlerf advised that Bester turn it in to Hogge. The witnesses also gave inconsistent stories about when Bester handed over the CD-ROM, when he made his statement, and at whose request.

Ultimately the ALJ credited Hughes over the Primo witnesses. The ALJ found that Hughes "testified in a straight forward manner concerning the events leading to his discharge." J.A. 938. Indeed, Hughes's testimony concerning his distribution of the CD-ROMs and the events of the termination meeting remained consistent throughout direct, cross, and rebuttal examination. He maintained that he never distributed union material on working time. He also maintained that when he initially entered the office on October 10,

17

Perini told him he was terminated and refused to reveal the name of his accuser or of any witnesses.

The ALJ noted that Perini's lack of a sufficient explanation for why she never interviewed Bringas and her self-serving disparate treatment testimony undercut her credibility. Perini testified that she found no need to interview Bringas, the only named witness to the alleged illegal distribution, because she simply believed Bester over Hughes. She also gave no compelling reason for not revealing Bester's name to Hughes and not allowing him to do any investigation on his own. Additionally, Primo's attempts to prove that it treated all of its lying employees similarly fell flat. In those cases, most of which post-dated Hughes's termination, Perini did speak to witnesses. In the one termination that preceded Hughes's, Perini seemed, on the witness stand, to fabricate dishonesty as a reason for firing an employee whom all of the evidence showed was fired for unsatisfactory job performance.

Exceptional circumstances that would allow us to overturn the ALJ's credibility determinations do not exist. The Primo witnesses' inconsistent testimony about the circumstances of the CD-ROM incident significantly undermines their credibility. Although Hughes had some trouble with his testimony, his daily log corroborates the key elements of his case and lends credence to his claim. Nothing in the record suggests that the ALJ's credibility

18

findings were unreasonable or that they contradict his other findings of fact.

The NLRB has provided enough evidence to meet its burden under Wright Line and FPC. By wearing his union t-shirt, discussing the union with co-workers, and distributing union materials, Hughes engaged in protected activity. Primo knew about that activity no later than August 26, when Gunzelman sent Hughes home for wearing a union t-shirt. Primo's subsequent treatment of Hughes provides enough evidence to support the final element: that Primo was motivated by anti-union animus in its termination of Hughes.

Sufficient evidence also supports the ALJ's conclusion that Primo's claimed reason of Hughes's dishonesty was mere pretext. Although it seems likely that Hughes did not work as hard or as quietly as Primo would have liked, Perini's lack of investigation concerning the CD-ROM distribution is suspicious, especially in the context of Primo's stated anti-union policy, the close eye managers kept on Hughes, and the efforts Primo made to move Hughes around when it became clear that he was advocating for the union. Primo's arguments that it could have fired Hughes because he was a poor worker and a disruption have no force because Primo only gave dishonesty as the reason it terminated Hughes. We find no reason to disturb the findings of the Board.

V.

Substantial evidence in the record as a whole supports the Board's conclusion that Primo fired William Hughes because of his protected union activity.  We therefore deny Primo's appeal, grant the NLRB's application, and order enforcement of the Board's order.

<u>PETITION FOR REVIEW DENIED;</u>
<u>CROSS-APPLICATION FOR ENFORCEMENT GRANTED</u>